**FORTNER ENTERPRISES, INC.,**
**Plaintiff,**

v.

**UNITED STATES STEEL CORPORATION and U. S. Steel Homes Credit Corporation, Defendants.**

**No. 4392.**

United States District Court
W. D. Kentucky,
Louisville Division.

Sept. 7, 1966.

Kenneth L. Anderson, A. Scott Hamilton, Jr., Louisville, Ky., for plaintiff.

Albert F. Reutlinger, Louisville, Ky., for defendants.

## MEMORANDUM OPINION

### JUDGMENT DISMISSING COMPLAINT AND AMENDED COMPLAINT

JAMES F. GORDON, District Judge.

*Preliminary Statement*

This is a civil anti-trust action brought under the Clayton Act, §§ 4 and 16, 38 Stat. 731, 737, 15 U.S.C. §§ 14 and 26, for alleged violation by the defendants of Sections 1 and 2 of the Sherman Act, 26 Stat. 209, 15 U.S.C. §§ 1 and 2. Although the complaint states that the action is instituted under 15 U.S.C. § 14, which is Section 3 of the Clayton Act, plaintiff now asserts that this was a typographical error. For the purpose of deciding the motion before the Court, this representation of the plaintiff has no bearing however in view of the court's opinion as set forth below.

The case is before the Court upon a motion for summary judgment for defendants, pursuant to Rule 56 of the Federal Rules of Civil Procedure and involves the legality of a provision in two loan agreements between the plaintiff, Fortner Enterprises, Inc. and U. S. Steel Homes Credit Corporation (sometimes hereinafter Credit Corporation), requiring plaintiff to erect a prefabricated dwelling house manufactured by United States Steel Homes Division (sometimes hereinafter Homes Division) of United States Steel Corporation (sometimes hereinafter Steel Corporation) on each of 219 lots in Jefferson County, Kentucky, with respect to which Credit Corporation agreed to loan money to plaintiff to assist in the acquisition and development of the property and the construction of dwellings. The first loan agreement, dated October 28, 1960, involved 187 lots, and was the subject of the plaintiff's original complaint, filed July 19, 1962. The second loan agreement, dated August 2, 1961, involved 32 lots, and was included within plaintiff's amended complaint, filed January 21, 1966.

### Statement of the Case

Plaintiff, in the early part of 1960 was a dormant corporation with a substantial (over $16,000) deficit. It was owned entirely by A. B. Fortner, Jr., of Louisville, Kentucky, with the possible exception of one share of common stock held by Mr. Fortner's wife. Until October 27, 1960, it was not authorized to engage in the building or real estate business. The defendant United States Steel Corporation had its manufacturing plant in New Albany, Indiana across the Ohio River from Louisville, Kentucky, There its Homes Division manufactured component parts for prefabricated dwelling houses. These component parts of prefabricated dwelling houses, sometimes called "home packages", are sold by the defendant Steel Corporation generally throughout the United States east of the Mississippi River and in a tier of states just west of that river. The defendant Credit Corporation is a wholly owned subsidiary of the other defendant Steel Corporation. Its sole business function is to furnish financial assistance to customers or dealers of the parent corporation's Homes Division, in instances in which they apply for such assistance and seem to be unable to obtain the same sort of assistance on reasonable terms from normal sources. The underlying purpose of the Credit Corporation's function is to enable its parent, in the sale of home packages, to compete with other building material manufacturers, sellers, lumber yards, brick factories and other prefabricated house manufacturers, who provide similar assistance to their customers.

With this background of the general situation, the court now turns to the precise point in issue which is whether the defendants, parent and subsidiary, allegedly "conspired to establish an *unlawful* tying agreement between the defendant Credit Corporation and the plaintiff Fortner Enterprises, Inc., which required the plaintiff to purchase and build homes manufactured and sold by U. S. Steel Corporation in plaintiff's subdivision in violation of Sections 1 and 2 of the Sherman Act". See Paragraph 1, Plaintiff's tendered instructions furnished the court pursuant to pre-trial order. In the light of this succinct statement of the plaintiff's basic claim, the court now examines in more detail the uncontroverted facts surrounding the execution of the first questioned contract, dated October 28, 1960. Shortly prior to that date plaintiff was a dormant corporation, controlled by A. B. Fortner, Jr. and had a substantial financial deficit. The defendant Homes Division was in the business of selling home packages. Plaintiff had available to it property in Jefferson County, Kentucky, suitable for subdivision purposes. This property was readily available to plaintiff because of Mr. Fortner's interest in another corporation then holding title to same. The plaintiff however had no funds to purchase or develop land or purchase home packages or otherwise build homes or indeed engage in any business.

There were ample funds available in Louisville, Kentucky during 1960 for borrowers. From local sources alone the figure exceeds $163,330,000. In addition to this figure $133,316,000 in real estate mortgages were recorded in Jefferson County, Kentucky in 1960. Credit Corporation had no monoply or "corner" on money at that time, nor does plaintiff contend to the contrary. Mr. Fortner was not then disposed to provide plaintiff with funds from any other source, including a personal investment, but instead applied for money from the Credit Corporation with which to buy property from the other corporation in which he had an interest. Thereafter plaintiff, using funds also borrowed from the Credit Corporation completed or at least partially completed the development of that property. And finally, again using funds borrowed from the Credit Corporation, constructed homes on part of the property thus acquired and developed utilizing in the construction thereof home packages purchased from the Steel Corporation. Plaintiff concludes in affidavits furnished by it that all of this was to the sole advantage of the defendants. The court finds however that in this particular transaction, (as in most transactions), both parties to the transaction felt it would be to their mutual advantage. Certainly the plaintiff was not coerced nor compelled to enter into the contract about which it now complains. Prior to the execution of the first contract it was not transacting any business of substance and entered into the arrangement with the expectation that it would be profitable to it.

The particular transaction is evidenced by three types of written documents. There are notes which are evidence of the debts incurred or to be incurred as funds were advanced. There is a mortgage in recordable form and a loan agreement which is the tie-in contract about which plaintiff now complains. All of these three types of documents are part of the same transaction. Indeed the loan agreement on its face recites that these documents constitute the "agreement" between the parties. The loan agreement in substance requires that while there is money due the Credit Corporation from the plaintiff the property encumbered by the mortgage shall be developed with single family dwellings utilizing as a component part thereof home packages purchased from the United States Steel Corporation, Homes Division. The property encumbered by the mortgage and hence subject to the provisions of the loan agreement consisted of approximately 55 acres in Jefferson County, Kentucky. At the time this contract was made, Jefferson County, Kentucky contained approximately 240,000 acres, of which approximately 171,484 acres were suitable for subdivision into single family lots or were then being so developed. In essence the arrangement between the plaintiff and the Credit Corporation is one of borrower-lender, with the lender imposing certain restrictions on the plaintiff's property purchased with the borrowed funds, but only while the debt remains unpaid. For our purposes here, the principal restriction while the debt is outstanding is the requirement that plaintiff utilize home packages purchased from the Credit Corporation's parent, when it constructs dwellings on the 55 acres purchased and developed with funds obtained from the Credit Corporation. The loan agreement is not an exclusive dealing contract within the normal use of that term. Plaintiff is *not* prohibited from purchasing prefabricated homes from the Steel Corporation's competitors or building conventional homes or engaging in any other business, competitive to the defendants or not, except on the 55 acres here involved. The day following the execution of this loan agreement, plaintiff under a similar arrangement with defendants' competitors, could well have purchased additional property, developed it and built homes on it, in competition with the defendants. As any time, plaintiff could have liquidated the debt to defendant Credit Corporation and be relieved from all obligation to it, including

the restriction or encumbrance affecting the 55 acres.

On October 31, 1960 plaintiff entered into a franchise contract with the Homes Division. But none of this transaction between the plaintiff and the defendant Credit Corporation affected in any way that franchise with the Homes Division. The Homes Division would sell home packages to anyone who could pay for same. It was not a requirement to become a franchise dealer or to buy home packages that any would be purchaser, including plaintiff, borrow money from the Credit Corporation. Nor was it a requirement if the would be purchaser, including plaintiff, needed to borrow money that it borrow money from the Credit Corporation. Nor would the plaintiff or any other franchise dealer lose his franchise because having once borrowed from the Credit Corporation, it liquidated that debt. In short, the transaction before the court is simply one in which certain restrictions as to use were placed on 55 acres of land in Jefferson County, Kentucky, while there was an outstanding debt in connection with the purchase and development of that property. There is no general restriction on the plaintiff nor any change in the situation as a result of the debt's liquidation, except that all restrictions are removed.

The same general facts relate to the second of the two questioned contracts, which was executed October 2, 1961, except that there, only an additional 7.3 acres were involved and the plaintiff had been engaged in the development of the subdivision acquired with the proceeds of the first loan for about seven months.

▉ No additional facts were suggested or offered at or prior to the hearing on defendants' motion for a summary judgment which would alter the basic facts outlined above. There can be no dispute as to the facts derived from the various contracts and documents since they speak for themselves. The size of the property restricted was not questioned. Therefore the court is compelled to the conclusion that the case is one for decision on summary judgment. That the defendants did or did not conspire to achieve the tie-in contracts is of no consequence at this time. It is the contracts themselves which give rise to and furnish the basis for plaintiff's claim. If these contracts do not meet the tests determining violations of the anti-trust acts, then they can furnish no claim for damages for a violation of the anti-trust laws, regardless of any other damage, real or imagined, flowing therefrom. Those claims simply may have become claims for breach of contract or related claims but are not within the purview of the anti-trust laws.

### Conclusions of Law

▉ The abandonment of a claim under the Clayton Act only serves to increase plaintiff's burden since that later statute is broader in its concept, and conduct which would violate Section 3 of the Clayton Act need not violate Sections 1 and 2 of the Sherman Act. This proposition is found conversely stated in the closing paragraph of Tampa Electric Co. v. Nashville Coal Co., 365 U.S. 320, 81 S.Ct. 623, 5 L.Ed.2d 580. This abandonment or "erroneous" complaint regarding Section 3 of the Clayton Act is of small consequence however since the court is of the opinion that the allegedly illegal tie-in contracts do not fall "within the broader proscription of § 3 of the Clayton Act" and hence do not violate the provisions of the Sherman Act on which plaintiff now professes to rely. Tampa Electric Co. v. Nashville Co., supra; Times-Picayune Publishing Co. v. United States, 345 U.S. 594, 73 S.Ct. 872, 97 L.Ed. 1277.

▉ On its face, the complaint is at variance with the Exhibit Loan Agreement (the questioned contract) filed as an exhibit thereto. The complaint will be controlled and modified by the terms of the written exhibit on which plaintiff bases its cause of action. Consolidated Jewelers Inc. v. Standard Financial

Corporation, 6 Cir., 325 F.2d 31; Ingram v. State Property and Building Corporation, Ky., 309 S.W.2d 169. It is desirable in a summary judgment proceeding to have the issues set forth in the complaint made clear. The complaint thus modified by its exhibit, alleges that a condition for borrowing money from the Credit Corporation is that plaintiff will use home packages purchased from the Steel Corporation in the construction of homes on the 55 acres in Jefferson County, Kentucky bought and developed with Credit Corporation's funds while the debt is outstanding. Reference is made to the Findings of Fact hereinabove set forth.

The amended complaint likewise must be modified by the Exhibit Loan Agreement, which by reference is incorporated as a part of it.

It is these loan agreements which plaintiff claims are illegal tie-in contracts, violative of Sections 1 and 2 of the Sherman Act. The fact of conspiracy or lack of it, surrounding or related to the execution of these contracts has no bearing on the matter at this point. If the contracts are illegal, under the facts attendant thereto, then plaintiff has a cause of action and may then proceed to prove conspiracy. And if successful in this endeavor to prove the damage flowing therefrom.

The court will only discuss in detail the earlier contract, executed in 1960. It will not be necessary to discuss the later (1961) contract, since it is similar to the earlier contract and for the reasons herein stated, the court's views on the earlier contract apply with equal vigor to the second and later contract, brought into this case by an amended complaint.

■ Tie-in contracts have been the subject of both public and private litigation. By public, the court means litigation instituted by the United States Government in enforcement of the anti-trust laws and by private the court means actions such as we have here. The United States Government has taken no part here, even earlier by civil or criminal action as sometimes happens. Even though the anti-trust laws expressly provide for private redress if those laws be violated, it still must be borne in mind that the ultimate aim is public good, "for it is the theory of the antitrust laws that the long-run advantage of the community depends on the removal of restraint upon competition." Standard Oil of California and Standard Stations v. United States, 337 U.S. 293, 69 S.Ct. 1051, 93 L.Ed. 1371. This is not to say that there are different standards between public and private litigation (unless expressly provided which is not the case here) in the general enforcement of the anti-trust laws, but clearly it is not the purpose of the anti-trust laws to furnish treble damages where there have been only ordinary breaches of contract, conspiracies to injure reputation or property, etc.

■ There are two distinct elements or parts of a tie-in contract, both of which must violate the anti-trust laws before such a form of contract can be the basis for a claim under those laws. A contract may be offensive as to one element or the other, yet not furnish the basis for an anti-trust action. Both requirements must be met. These contracts "are unreasonable in and of themselves whenever a party has sufficient economic power with respect to the tying product to appreciably restrain free competition in the market for the tied product *and* a 'not insubstantial' amount of interstate is affected". Northern Pacific Railroad Co. v. United States, 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed.2d 545. Phrased another way, to make a tie-in contract illegal, the offender must possess "monoply power or, at the very least a high degree of economic control in the market for the tying service *and*" the tie-in result in a "substantial restraint upon competition in the market for the tied service". Centanni v. T. Smith & Son, Inc., D.C., 216 F.Supp. 330. See also International Salt Company v. United States, 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20, and Times-Picayune Publishing Co. v. United States, 345 U.S. 594,

73 S.Ct. 872, 97 L.Ed. 1277. The court will discuss the elements of a tying contract in the order indicated. Here money from the Credit Corporation is the tying product and home packages sold by the Steel Company are the tied product.

■ Obviously and as indicated in the court's Statement of the Case, the defendant Homes Corporation does not enjoy a monopoly of, nor a patent on money. Plaintiff argues, because of its financial plight at the time it made the contract, Credit Corporation's agreement to 100% financing was so unique that this was tantamount to monopoly power or a high degree of control of the tying product. Credit Corporation's generosity to the plaintiff does not go to the availability of the tying product in the market place and obviously others, if they chose, could lend to plaintiff money on the same terms and conditions as defendant Credit Corporation. Simply stated, a plan or proposal for the generous use of the tying product (money) is not equivalent to economic power with respect to the tying product. The test set in the cited cases is not met simply by contending the proposal for the use of the tying product is more generous than others may propose. The unique feature of Credit Corporation's plan and its attraction for the plaintiff is not general and it must be general in the market place to fulfill the requirements found in the cited cases. Indeed many people may not find Credit Corporation's arrangement with plaintiff attractive. They may not desire the restrictions or find them useful. If however Credit Corporation enjoyed monopoly or a high degree of economic control in the market for money, others would have no choice but to adopt the plan. The test is universal compulsion not a peculiar attraction for one corporation as here. This singular attraction does not create market dominance or economic control over the product in and of itself and "of course where the seller has no control or dominance over the tying product so that it does not represent an effectual weapon to pressure buyers into taking the tied item any restraint of trade attributable to such tying arrangements would obviously be insignificant at most". Northern Pacific Railroad Co. v. United States, supra. This principle leads logically to consideration of the second element required to be found in an illegal tie-in contract.

To be bad under the anti-trust laws the contract must also create a substantial restraint on competition involving the sale of the tied product (home packages). If the relevant market concept as to the restriction found in the contract would relate to the area in which the defendant Steel Corporation competed, comparison between the 55 acres affected and the total area in which the Steel Corporation competes in the sale of its home packages becomes ludicrous. Tampa Electric Co. v. Nashville Co., supra. Being more realistic, since plaintiff conducts only a local operation, the court feels the geographical comparison for the effect on interstate commerce should be made between Jefferson County, Kentucky and the encumbered 55 acres. But even here the discrepancy between the restricted property and the portion of the county available for development is great. Only .00032% of the available area in the county is affected by the contract. To further lessen the strain, if any, on competitive restraint, the loan agreement does not prohibit plaintiff generally from purchasing competitive products from others and it permits complete competition when the indebtedness to the Credit Corporation is liquidated. All of this without effect on plaintiff's franchise contract with the Steel Corporation.

Hypothetical illustrations of possible situations under the present contract, as it affects competition, will demonstrate the weakness and minimal effect of it on competition. Suppose the Steel Corporation produced a markedly inferior product and was unable to sell it without some sort of a tie-in device (and here the court assumes Credit Corporation has a monopoly on money). The

present arrangement captures for the defendants certain territory (55 acres) in Jefferson County, Kentucky, leaving to the general public 99.99968% of that county in which to build homes purchased from Steel Corporation's competitors. This could include purchases through the medium of the plaintiff itself since it was not generally restricted. Thus, both the general public and the defendants' competitors have practical freedom of choice in Jefferson County, Kentucky. A second illustration will indicate the fallacy of claiming that it is the market for single dwellings or even in a more restricted sense, prefabricated single family dwellings, from entering into the concept. Assume the absurd but legally possible situation in which Jefferson County, Kentucky's market for single family or prefabricated single family dwellings was only one such dwelling unit annually. In the situation before the court, the potential buyer of that single family dwelling unit from plaintiff, or from others in competition with plaintiff, or directly from suppliers in competition with the defendant Steel Corporation, or anyone, has 99.99968% of the county in which to locate the home and fulfill his needs. In summary, the restriction here fails to "suffer the qualifying disability" which is a "tendency to work a substantial—not remote—lessening of competition in the relevant competitive market". Tampa Electric Co. v. Nashville Co., supra.

For the foregoing reasons, the court concludes as a matter of law that the contract fails to meet either of the requirements necessary for it to be illegal under the anti-trust laws.

### Other Matters

The affidavit of Albert F. Reutlinger is ordered filed of record herein, there being no objection on the part of plaintiff.

Defendant's tender of an amended answer setting up a Fourth Defense, that of pari delicto, served by mail on plaintiff's attorney June 10, 1966 comes too late and this amended answer will not be permitted to be filed.

In view of the court's decision on defendants' motion for a summary judgment, it is not necessary that it consider or rule on other pending motions made by the defendants directed to the amended complaint, nor does it rule on any of the objections made by the defendants to certain exhibits which plaintiff indicated it would tender at the trial of the case.

Plaintiff's counsel, several days after the hearing on defendants' motion for a summary judgment, tendered his affidavit and that of Herman Miles, to be considered in connection with that motion. This is too late. These affidavits should have been filed prior to the day of the hearing to be considered. See Rule 56. They may not now be filed. The content of these affidavits however, had they been considered, is such as would not affect the court's decision on the summary judgment.

During the course of the recent hearing, plaintiff suggested that the judgment entered January 15, 1964, in Action Number 4392–A, styled Fortner Enterprises, Inc. v. U. S. Steel Homes Credit Corporation was not final and would be appealed. The record discloses that this companion case arose out of a counterclaim by defendant U. S. Steel Homes Credit Corporation to obtain a judgment for the funds advanced and to foreclose the mortgage securing the debt then in default. After the issues were joined by reason of the counterclaim, this court entered an order separating the trial of the within anti-trust action from the mortgage foreclosure action. Thereafter, in the mortgage foreclosure action certain issues were raised and resolved by a judgment. This judgment finally and fully disposed of all issues between the *two* parties to Action Number 4392–A in this court, styled Fortner Enterprises, Inc., Plaintiff v. U. S. Steel Credit Corporation, Defendant. Judge Shelbourne, now Senior Judge of this court, entered the judgment in that fore-

closure action. It is his opinion and belief, and in it the court concurs, that the judgment entered in that separate foreclosure action was a final judgment and subject to appeal from and after the date of its entry, since it disposed of all issues then pending between the parties to that separate action.

## CONCLUSION

Plaintiff's motion to have the affidavits of Kenneth L. Anderson and Herman Miles filed is overruled. They may be tendered.

Defendants' motion to have the court order its amended answer tendered July 6, 1966 filed of record is overruled. No order is entered on other pending motions, except on defendants' motion for a summary judgment. This motion for a summary judgment is sustained, and the complaint and the amended complaint are dismissed, plaintiff to pay all costs.