FORTNER ENTERPRISES, INC.,
Plaintiff-Appellee,

v.

UNITED STATES STEEL CORPORA-
TION and United States Steel Homes
Credit Corporation, Defendants-Appel-
lants.

No. 71–1194.

United States Court of Appeals,
Sixth Circuit.

Dec. 16, 1971.

Macdonald Flinn, New York City, for defendants-appellants; Middleton, Seelbach, Wolford, Willis & Cochran, Louisville, Ky., White & Case, New York City, on brief; Albert F. Reutlinger, Louisville, Ky., Macdonald Flinn, Thomas B. Leary, New York City, of counsel.

Kenneth L. Anderson, Louisville, Ky., for plaintiff-appellee; Kenneth L. Anderson, Woodward, Hobson & Fulton, A. Scott Hamilton, Jr., Hamilton, Hopson, Long & Rogers, Louisville, Ky., on brief.

Before MILLER and KENT, Circuit Judges, and CECIL, Senior Circuit Judge.

WILLIAM E. MILLER, Circuit Judge.

This is the second appeal in this private antitrust action.[1] At the first trial

---

1. The action was instituted by Fortner Enterprises, Inc. against U. S. Steel Corporation and its wholly owned subsidiary, the U.S. Steel Homes Credit Corporation,

the district court granted summary judgment for the defendants, holding that petitioner had failed to raise any question of fact as to a possible violation of the antitrust laws. Fortner Enterprises, Inc. v. United States Steel Corp. et al., 293 F.Supp. 762 (1966). The judgment was affirmed by this Court without opinion, 404 F.2d 936, but the Supreme Court in a 5–4 decision, holding on the facts set forth in the record as it was constituted at that time, that summary disposition was improper and the action should go to trial, reversed the judgment of affirmance of this Court and remanded the action with directions that it proceed to trial. Fortner Enterprises, Inc. v. United States Steel Corp., 394 U.S. 495, 89 S.Ct. 1252, 22 L.Ed.2d 495 (1969). The majority and minority opinions in this case have stimulated much general interest and wide scholarly examination.[2] Upon remand, the district judge, after a trial before a jury which occupied approximately one month, sustained the plaintiff's motion for a directed verdict and overruled the defendants' similar motion. He submitted to the jury only the question of damages which should be awarded in favor of the plaintiff. The jury returned a verdict in the amount of $93,200.00 which was trebled by the court. Motions for judgment n.o.v. and, alternatively, for a new trial were denied and judgment for the plaintiff was entered on November 23, 1970. The de-

fendants raise no question on the present appeal as to damages, having elected to limit the appeal to the issue of liability under the Sherman Act. Their insistence is that the court erred in directing a verdict in favor of the plaintiff and that, on the contrary, the court should have sustained the defendants' motion for a directed verdict. It is argued, in the alternative, that at least the case was one for the jury and that the action should be remanded for a new trial before a jury on the question of liability only, the damage issue already having been decided by a jury.

In its original and amended complaints the plaintiff charged that the defendants had engaged in a contract, combination, and conspiracy to restrain trade and to monopolize trade in the sale of prefabricated houses. Alleging that there was a continuing agreement between the defendants to force the plaintiff and other corporations and individuals, as a condition to availing themselves of the services of the Credit Corporation, to purchase at artificially high prices only U. S. Steel Homes, plaintiff specifically claimed that in order to obtain loans totaling over two million dollars from the Credit Corporation for the purchase and development of certain land in the Louisville, Kentucky, area, it had been required to agree, as a condition of the loans, to erect a prefabricated house manufactured by U. S. Steel Corporation on each of the lots pur-

---

pursuant to Secs. 1 and 2 of the Sherman Act, 15 U.S.C. Secs. 1 and 2, seeking treble damages and injunctive relief against further violations.

2. We are aware of the controversy which surrounds the tying arrangement cases generally, a controversy involving differences over both economic policy (See, e. g. Markovitz, Tie-ins, Reciprocity, and the Leverage Theory, 76 Yale L.J. 1397 (1967) ; Bowman, Tying Arrangements and the Leverage Problem, 67 Yale L.J. 19 (1957) ; and the proper application of legal doctrine (See, e. g. Kauper, The Warren Court and the Anti-trust Laws: Of Economics, Populism and Cynicism, 67 Michigan L.Rev. 325 (1968) ; Pearson, Tying Arrangements and Antitrust Policy,

60 NW.L.Rev. 626 (1965). We have studied with interest and special care the scholarly comments which the Supreme Court's opinions in this case have generated, finding especially useful a note: The Logic of Foreclosure: Tie-in Doctrine after Fortner v. U. S. Steel, 79 Yale L.J. 86 (1969). See also, Dam, Fortner Enterprises v. United States Steel: "Neither A Borrower, Nor A Lender Be," 1969 Supreme Court Review 1; Recent Trends in Supreme Court Antitrust Decisions: Commentary—Past, Present and Future, 38 Antitrust Law Journal 602 (1969) ; Note, Credit As a Tying Product, 69 Col.L.Rev. 1435 (1969) ; and The Supreme Court, 1968 Term, 83 Harv.L.Rev. 235.

chased with the loan proceeds. It was further claimed that the prefabricated materials were then supplied by U. S. Steel at unreasonably high prices and proved to be defective and unusable thus requiring the expenditure of additional sums and delaying the completion date for the development.

 To determine whether a directed verdict is appropriate the governing principle is that a verdict may properly be directed only when, without weighing the credibility of the witnesses, there can be but one reasonable conclusion as to the verdict. Where there is conflicting evidence or insufficient evidence to make only a "one way" verdict possible, a directed verdict is improper. Brady v. Southern Railway Co., 320 U.S. 476, 479–480, 64 S.Ct. 232, 88 L.Ed. 239 (1943); 5A Moore's Federal Practice ¶ 50.02 [1] pp. 2321, 2. An appellate court too is bound to view the evidence in the light most favorable to the party against whom the motion for a directed verdict is made and give him the advantage of every fair and reasonable inference that the evidence may justify. Continental Ore Co. v. Union Carbide & Carbon Corp., 370 U.S. 690, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962); 5A Moore's Federal Practice, ¶ 50.02[1] pp. 2326, 7.

 Examining the record on the basis of these standards and in the light of the Supreme Court's opinion in this case, we find that while the plaintiff made out a prima facie case of Sherman Act violations the evidence and permissible inferences therefrom are in such conflict that neither party was entitled to a directed verdict. Instead the question of liability should have been submitted to the jury as well as the question of damages. Both the plaintiff and defendants to support their respective positions rely upon the Supreme Court's

opinion in this case on the first appeal. In doing so they quote selective portions from the opinion which tend to indicate some support for the particular views which they espouse. It becomes necessary, therefore, in the resolution of this appeal to examine the Supreme Court's opinion to discover its real thrust and impact in the context of the facts of the present litigation as they were developed at the second trial.

At the outset it is well to bear in mind that on the first appeal the Supreme Court was not considering the alleged antitrust violations in the light of a full trial on the merits. Rather the specific question before it was a procedural one, i.e., whether it was appropriate for the district court on the basis of the facts as they had been developed from affidavits and pretrial procedures to dispose of the case by summary judgment. That the Court did not intend to indicate any view as to what the trier of the facts should find from the evidence was expressly pointed out when the Court said that it might turn out that the plaintiff's allegations will not be sustained when the case goes to trial. "It may turn out," as the Court further stated, "that the arrangement involved here serves legitimate business purposes and that U. S. Steel's subsidiary does not have a competitive advantage in the credit market. But on the record before us it would be impossible to reach such a conclusion as a matter of law, and it is not our function to speculate as to the ultimate findings of fact." It is also of significance that the Court indicated its reluctance to dispose of antitrust cases by summary procedure. Addressing itself specifically to the use of summary judgment procedure in antitrust cases, the Court stated: "Since summary judgment in antitrust cases is disfavored, Poller,[3] supra, the claims of uniqueness

---

3. In Poller v. Columbia Broadcasting System, Inc., et al., 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962), the Court in stating that summary procedures should be used sparingly in complex antitrust litigation used language

which we think is of significance in determining the appropriateness of directing a verdict in this case rather than submitting the issues to a jury for evaluation:

We look at the record on summary judgment in the light most favorable to

in this case should be read in the light most favorable to petitioner." (Plaintiff).

It was developed at trial that the Homes Division of U. S. Steel manufactures component parts for prefabricated houses, selling what it terms home packages in various states. The sales are made through dealer-builders such as the plaintiff. U. S. Steel's subsidiary, the Credit Corporation, was founded in 1954 as a wholly owned subsidiary for the purpose of providing financial assistance to the Homes Division's dealer-builders who were unable to obtain suitable financial assistance from more conventional sources. In effect the services of the Credit Corporation were a "tool" to assist the Homes Division in the sale of its houses. Beginning in 1958 the policies of the Credit Corporation were changed, when a program of "special assistance" was initiated whereby credit was made available in high risk situations on particularly reasonable terms to Homes Division dealer-builders. As reflected by the minutes of the U. S. Steel finance committee, the purpose of the policy was to enable Homes Division "to attain a minimum of 1800 units in 1959." To reach this goal and such additional distribution as may be feasible the Credit Corporation was directed to make loans to dealers without conformity to conventional or conservative patterns "but within the bounds of prudent business judgment." It was contemplated that Homes Division would underwrite such loans, guaranteeing losses to a defined extent.

In 1959 it came to the attention of the Homes Division that certain land in an existing subdivision in the Louisville, Kentucky, area might be available for development. The land was owned by a corporation in which A. B. Fortner, a successful and well-known real estate developer, held a 50% interest. Later in that year U. S. Steel initiated discussions with Fortner with the idea that the property might be an attractive vehicle for it to enter the Louisville prefabricated housing market. Following negotiations an agreement was reached whereby Fortner's wholly-owned corporation, Fortner Enterprises, Inc., would become a franchised dealer-builder of the Homes Division product. It was part of the agreement that the Credit Corporation would extend credit to the plaintiff corporation for the development conditioned upon the construction on each of the 187 lots purchased by the plaintiff, a prefabricated house from the Homes Division of U. S. Steel. The initial loan was $2,055,300.00. Interest at the rate of six per cent per annum, plus a service charge of one-half of 1%, was to be charged. Of the total commitment, $373,200.00 was to cover the cost of acquisition and development of the lots; the remainder was to cover the purchase and construction of the houses. The land loan equaled 100% of the cost of the land acquisition and development.

There was evidence that the plaintiff experienced difficulties with the U. S. Steel products, including the omission of parts and the delivery of defective parts which necessitated additional work. Substantial complaints were made with

Poller, the party opposing the motion, and conclude here that it should not have been granted. We believe that summary procedures should be used sparingly in complex antitrust litigation where motive and intent play leading roles, the proof is largely in the hands of the alleged conspirators, and hostile witnesses thicken the plot. It is only when the witnesses are present and subject to cross-examination that their credibility and the weight to be given

their testimony can be appraised. Trial by affidavit is no substitute for trial by jury which so long has been the hallmark of "even handed justice."

Although summary judgment and a directed verdict are procedurally distinguishable both substitute the court for the jury as the factfinder. Some of the considerations dictating a reluctance to resort to summary judgment in complex antitrust cases are equally applicable to the direction of a verdict.

respect to the Homes Division products from home owners who had purchased the homes from Fortner. Yet during this period Fortner requested additional financing for the purchase and development of land on which Homes Division houses were to be placed. Thus, on August 2, 1961, Fortner executed a land and mortgage note in the amount of $59,000.00 and a construction note in the amount of $403,400.00. Having continued to experience difficulties with the prefabricated houses and having run out of cash, Fortner requested that he be relieved of the requirement that the financing be used for the construction of Homes Division houses. This request was refused but Fortner was advised that he was free to refinance the Credit Corporation's loan and proceed to obtain houses from other sources. Thereafter, in July 1962 he instituted the present action.

In Northern Pacific Railway Co. et al. v. United States, 356 U.S. 1, 78 S. Ct. 514, 2 L.Ed.2d 545 (1958), the Supreme Court defined the tying arrangement device, identified its evils and stated the prerequisites for per se illegality in the following fashion:

> For our purposes a tying arrangement may be defined as an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier. Where such conditions are successfully exacted competition on the merits with respect to the tied product is inevitably curbed. Indeed "tying agreements serve hardly any purpose beyond the suppression of competition." Standard Oil Co. of California v. United States, 337 U.S. 293, 305–306 [69 S.Ct. 1051, 93 L.Ed. 1371]. They deny competitors free access to the market for the tied product, not because the party imposing the tying requirements has a better product or a lower price but because

of his power or leverage in another market. At the same time buyers are forced to forego their free choice between competing products. For these reasons "tying agreements fare harshly under the laws forbidding re straints of trade." Times-Picayune Publishing Co. v. United States, 345 U.S. 594 [73 S.Ct. 872, 97 L.Ed. 1277].

> They are unreasonable in and of themselves whenever a party has sufficient economic power with respect to the tying product to appreciably restrain free competition in the market for the tied product and a "not insubstantial" amount of interstate commerce is affected. International Salt Co. v. United States, 332 U.S. 392 [68 S.Ct. 12, 92 L.Ed. 20]. Cf. United States v. Paramount Pictures, 334 U. S. 131, 156–159, 68 S.Ct. 915, 92 L.Ed. 1260; United States v. Griffith, 334 U.S. 100 [68 S.Ct. 941, 92 L.Ed. 1236]. Of course where the seller has no control or dominance over the tying product so that it does not represent an effectual weapon to pressure buyers into taking the tied item any restraint of trade attributable to such tying arrangements would obviously be insignificant at most. As a simple example, if one of a dozen food stores in a community were to refuse to sell flour unless the buyer also took sugar it would hardly tend to restrain competition in sugar if its competitors were ready and able to sell flour by itself. 356 U. S. at 5, 6 and 7, 78 S.Ct. at 518.

Once it is established that a tying arrangement exists, it must be determined whether a "not insubstantial" amount of commerce is affected by the tie and whether the tier has "sufficient economic power" in the market for the tying product.

We need not deal at length with whether a "tying arrangement" exists in this case, nor whether the amount of commerce affected is "not insubstantial." The Court rejected Mr. Justice

Fortas' argument that this was not a "tying arrangement":

> We agree with the District Court that the conduct challenged here primarily involves a tying arrangement of the traditional sort. 394 U.S. at 498, 89 S.Ct. at 1256.

On the matter of whether the volume of commerce allegedly foreclosed was "not insubstantial" the Court stated:

> The complaint and affidavits filed leave no room for doubt that the volume of commerce allegedly foreclosed was substantial. It may be true, as respondents claim, that petitioner's annual purchases of houses from U. S. Steel under the tying arrangement never exceeded $190,000, while more than $500,000 in annual sales was involved in the tying arrangement held illegal in *International Salt, but we cannot agree with respondents that a sum of almost $200,000 is paltry or "insubstantial."* 394 U.S. 501, 502, 89 S.Ct. 1258 (Emphasis added).

The issues raised regarding the second standard, that of "sufficient economic power," is far more troublesome, but we think that so far as the present record reflects, the issue should have gone to the jury. Of this issue, Mr. Justice Black stated that ". . . the pleadings and affidavits sufficiently disclosed the *possibility* of market power over borrowers in the credit market to entitle petitioner to go to trial on this issue." (Emphasis added.)

In other Supreme Court cases in which a "tying arrangement" has been found to be illegal per se under the Sherman Act, this question did not pose the same factual uncertainty as here. Sufficient economic power was shown in International Salt Co. v. United States, 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20 (1947), by the simple fact that the tying product was patented; in United States v. Loew's, Inc., 371 U.S. 38, 83 S.Ct. 97, 9 L.Ed.2d 11 (1962), the tying product was copyrighted; and in Northern Pacific Railway Co. et al. v. United States, 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958), it was the physical uniqueness of the land which constituted the tying product.

Here no such talisman exists. The Court rejected Fortner's "apparent argument that market power can be inferred simply because the kind of financing terms offered by a lending company are 'unique and unusual.'" Having done so, however, the Court refused to specify precisely what proof would satisfy the standard of the per se rule. Yet the Court was not entirely silent as to the sort of proof which could be weighed in determining the existence of the necessary "economic power" in the tying product.

Under the antitrust statutes, the tying cases are fundamentally based on the notion that competitive advantage in one market (that of the tying product), whether the result of a patent, copyright, physical uniqueness, a cost advantage or whatever else might serve as a source of leverage, should not be translated into a competitive advantage in another distinct market (that of the tied product).

The focus of our present inquiry is whether the Credit Corporation possessed leverage in the credit market (the "tie" here being the extension of credit) sufficient to induce buyers in the market for prefabricated houses (the "tied" product) to accept a less competitive product.

It is clear that such leverage need not be of sufficient magnitude to constitute monopoly power or even market dominance. As stated in the majority opinion in this case:

> The standard of "sufficient economic power" does not, as the District Court held, require that the defendant have a monopoly or even a dominant position throughout the market for the tying product. Our tie-in cases have made unmistakably clear that the economic power over the tying product can be sufficient even though the power falls far short of dominance and even though the power exists only

with respect to some of the buyers in the market. See, *e. g.*, International Salt; Northern Pacific; United States v. Loew's Inc., 371 U.S. 38, 83 S.Ct. 97, 9 L.Ed.2d 11 (1962). 394 U.S. at 502, 503, 89 S.Ct. at 1258.

And in United States v. Loew's Inc., 371 U.S. 38, 83 S.Ct. 97, 9 L.Ed.2d 11 (1962), the Court stated:

> . . . Even absent a showing of market dominance, the crucial economic power may be inferred from the tying product's desirability to consumers or from uniqueness in its attributes. 371 U.S. at 45, 83 S.Ct. at 102.

As we have pointed out, the Court expressly rejected Fortner's "apparent" argument that the uniqueness of the loan, namely the fact that one hundred per cent land financing may have been unavailable elsewhere in Louisville at the time the loan commitment was made, alone constitutes proof of "sufficient economic power." It was apparently the view of the Court that, while plaintiff need not prove dominance in the credit market on the part of the Credit Corporation, it must prove that the "unique and unusual" terms offered by the Credit Corporation reflected some unique economic advantage over its competitors. The Court pointed to two possible sources of such advantage: (1) competitors in the credit market might be legally precluded from offering credit on such terms; and (2) the Credit Corporation might enjoy some cost advantage not shared by potential competitors in the relevant credit market in Louisville. The Court did not preclude the possibility of other sources of leverage.

Turning to the evidence with respect to these two possible sources of economic power suggested by the Supreme Court, judicial notice may be taken of the fact that national banks may make loans only on improved real estate, and that federally insured savings and loan associations are limited to loans up to 70% of the real estate as developed. Yet the record appears to be barren of any evidence that other lending institutions in the Louisville area were subject to the same prohibition, such as mutual savings banks, credit unions, pension funds, finance companies, mortgage companies, building and loan associations, and insurance companies. A jury should be permitted to evaluate the significance of the freedom of such traditional lending sources from any restriction against extending 100% financing in deciding whether competitors in the Louisville credit market were precluded from offering credit on such terms. On the same facet of the case there was testimony at trial that soon after plaintiff negotiated its financing terms with the defendants for 100% financing, traditional lending agencies in Louisville indeed began offering loans upon the same basis. Such fact, while not conclusive of the situation as it existed at the time plaintiff's loans were consummated, could be appropriately considered by a jury in reaching the ultimate conclusion whether the Credit Corporation had economic power in the credit market so as to come within the per se rule. Further, while the plaintiff offered some evidence that 100% financing was not generally available on the Louisville market at the time of its financing with the Credit Corporation, it must be conceded that the amount of the loan as a percentage of the collateral or security is only one element in determining its advantage to a borrower. Other relevant factors, as appropriately pointed out by the defendants, include the rate of interest charged, whether the lender discounts the amount loaned or charges service or other fees, and the maturity and terms of repayment. Proof alone that an institution is prohibited from granting 100% land financing would therefore seem to be insufficient to establish the fact that it is unable to offer terms embodying other elements which would make its financing equally favorable or advantageous to the borrower.

As to the second factor suggested by the majority opinion, (that of a possible cost advantage) we again find that the

record is open to varying interpretations, inferences and conclusions. It is true that the Credit Corporation as a wholly owned subsidiary of U. S. Steel was able to obtain funds for lending purposes at the prime rate, and that U. S. Steel necessarily stood behind repayment of any funds which the Credit Corporation was required to borrow. Also, as a subsidiary of U. S. Steel, it may be inferred that the Credit Corporation was not expected to maximize profits but to assist in the sales of the Homes Division houses. During the relevant period no dividends were paid to the parent corporation and there is no evidence that the Credit Corporation competed aggressively as a lender. These considerations could conceivably be taken by a jury as some evidence that the Credit Corporation was able to make loans at a level of risk unacceptable to most lending institutions. On the other hand, the record justified the conclusion that the Credit Corporation, while not operating at a loss, had comparatively low profits. Its total net profits in 1960 and 1961 were $52,197.00 and $59,053.00, respectively. In those same years its earnings in relation to net worth were 4.5% and 4.8%. At least two local mortgage companies in Louisville had higher earnings in relation to net worth in both of these years. There is no showing in the record that there were lenders in or out of Louisville having higher costs or lower profitability than the Credit Corporation. Of course, the Credit Corporation, as the evidence demonstrated, incurs the usual operating costs of a lending institution, including clerical and management salaries, rent, charges for office equipment, supplies, services, taxes, etc. Moreover, it would be relevant for the jury to take into account that the Credit Corporation operates at some disadvantage in that traditional lending agencies doing business in a community on a continuing basis serve a concentrated geographic area having a larger and more diversified clientele of borrowers permitting them to achieve cost savings and efficiencies not available to a lender engaged in a business like that of the Credit Corporation. It is also possibly true that traditional lending institutions are in position to spread their risks and costs both over a larger volume of business and over different areas of the economy.

The Credit Corporation obtained its funds primarily from banks. In 1961, it had borrowed from banks approximately ten to fourteen million dollars. For the borrowing of these funds it paid the prime rate. On the funds which it borrowed from U. S. Steel it paid the prime rate plus one per cent. It may be that the jury could infer from the record that the Credit Corporation incurred higher costs in acquiring money to lend than the costs incurred by commercial banks, savings and loan associations and insurance companies. In this connection it must be remembered that we are here dealing not with advantages which a finance subsidiary may give to its parent in relation to competitors in the parent's line of business, but with the question whether the finance subsidiary has a unique advantage over financial institutions and other competitors in the lender's market.

Plaintiff also points to the fact that the Homes Division guaranteed or underwrote the land financing extended to plaintiff and certain others. It is argued that this fact demonstrates economic power over credit. This conclusion, in our view, is not necessarily true. On the contrary, it may simply be a factor which demonstrates that it was necessary for the Credit Corporation to be subsidized against any loss incident to the greater cost and risk involved. Doubtless other lending institutions in the relevant market were of sufficient strength and soundness to inspire confidence in their loan commitments.

Plaintiff's reference to the Supreme Court majority's statement in regard to the Homes Division houses being priced some $400.00 higher than comparable houses would not appear to have any conclusive effect on the question which we are now considering. It is clear

from the opinion that Mr. Justice Black and those justices who joined him in the majority opinion did not reach any definitive conclusion as to the effect of this factor. On the contrary, as pointed out, they merely said that a substantial price differential "may suggest" or is not inconsistent with the "possibility of market power." The evidence on this question should be weighed by the jury and its proper probative value determined.

While the plaintiff claims a violation of Sec. 2 of the Sherman Antitrust Act, we do not deem it necessary to discuss the evidence on this question since it consists substantially of the same evidence offered in support of the alleged Sec. 1 violation. We are satisfied that the total evidence, measured in terms of the principles enunciated by the majority opinion of the Supreme Court on the first appeal, make it inappropriate for the Court to approve a directed verdict for either party in this case on the liability issues under Secs. 1 and 2 of the Sherman Act.

In Advance Business Systems & Supply Co. v. SCM Corporation, 415 F.2d 55 (4th Cir. 1969), cert. denied 397 U.S. 920, 90 S.Ct. 928, 25 L.Ed.2d 101 (1970), the Court, as the plaintiff argues, interpreted Fortner as holding that ". . . the 'sufficient economic power' test of per se illegality is satisfied when it appears that the seller has the power to 'impose other burden-

some terms such as a tie-in with respect to any appreciable number of buyers within the market.'" Plaintiff in its brief relies upon this interpretation and insists that the directed verdict in its favor was justified on the basis of this interpretation of *Fortner* by the Fourth Circuit. As we read the majority opinion in *Fortner*, the holding was that a tying arrangement achieves an unlawful restraint when "the seller can exert some power over some of the buyers in the market." The majority opinion did not hold that the acceptance of the tie-in by customers without more is proof of economic power. If the majority had intended to indicate that acceptance of a tie-in by an appreciable number of customers is sufficient proof of the requisite economic power, it would have been sufficient for Mr. Justice Black to have said so and thus to avoid the exhaustive treatment which he gave to the question of economic power in the tying product set forth in other portions of his opinion.

The judgment of the district court insofar as it sustained the plaintiff's motion for a directed verdict is accordingly reversed, and the action is remanded to the district court for trial before a jury on the question of liability under Secs. 1 and 2 of the Sherman Act. The judgment is affirmed insofar as it denied the defendants' motion for a directed verdict.[4]

4. We have not undertaken in this opinion to discuss all of the items of evidence bearing upon the question of economic power. Plaintiff relies heavily, for example, upon evidence tending to indicate that the Credit Corporation was both able and willing to lend to high risk borrowers at a rate of interest commensurate with a much lower level of risk, i. e., to offer credit on terms otherwise unavailable at the time. The guarantees and the Credit Corporation's relationship to U. S. Steel are pointed to as possible sources of leverage. Upon remand, these items and the entire range of evidence bearing upon this issue should be submitted to the jury. Insofar as the complaints allege a per se violation due to a tie-in assuming that the evidence developed is substantially the same as that offered at the first trial, the trial judge may appropriately instruct the jury that the tie-in itself has been established as a matter of law, and that the amount of commerce affected is "not insubstantial." On this aspect of the case, the issue for the jury is whether the Credit Corporation, in the language of Northern Pacific Railway Co. et al. v. United States, *supra*, had "sufficient economic power with respect to the tying product to appreciably restrain free competition in the market for the tied product . . . ." Admittedly this is a standard which must vary in application from case to case, but the jury should be free to determine the issue on the basis of the entire evidence, (some of which we have commented upon) free from the limitations of an arbitrary definition.