**FORTNER ENTERPRISES, INC.,**
**Plaintiff-Appellee,**

v.

**UNITED STATES STEEL CORPORATION and United States Steel Homes Credit Corp., Defendants-Appellants.**

No. 75–1208.

United States Court of Appeals,
Sixth Circuit.

Argued June 9, 1975.

Decided Oct. 3, 1975.
Certiorari Granted Feb. 23, 1976.
See 96 S.Ct. 1100.

Albert F. Reutlinger, Middleton, Reutlinger & Baird, Louisville, Ky., Macdonald Flinn, White & Case, New York City, for defendants-appellants.

Kenneth L. Anderson, Woodward, Hobson & Fulton, A. Scott Hamilton, Jr., Hamilton, Metry, Vish, Milliman & Porter, Louisville, Ky., for plaintiff-appellee.

Before WEICK and MILLER, Circuit Judges, and CECIL, Senior Circuit Judge.

WILLIAM E. MILLER, Circuit Judge.

This private antitrust action is before us on appeal for the third time in twelve years. The action involves a tying arrangement in which U. S. Steel tied the purchase of prefabricated houses to credit given to finance the acquisition and development of land on which they were to be built.

The Homes Division of U. S. Steel manufactures prefabricated houses and sells them through builder-dealers like the plaintiff. In 1954 its wholly-owned subsidiary, the Credit Corporation, was founded to provide financial assistance to those builder-dealers who were unable to obtain suitable financing from more conventional sources. Initially, the Credit Corporation's assistance was limited to financing purchase and construction of the houses, but it later was extended in some cases to acquisition and development of land on which the houses were

to be built. In 1958 a program of "special assistance" was begun whereby credit was made available in certain high risk situations without regard to "conventional or conservative patterns but within the bounds of prudent business judgment." The Homes Division guaranteed these special loans to protect the Credit Corporation from loss. The purpose of Credit Corporation's regular and special financing was always to assist the Homes Division's house sales.

In 1959 the Homes Division became interested in land available for development in an existing subdivision in Louisiville, Kentucky. U. S. Steel initiated discussions with one A. B. Fortner, a successful real estate developer, looking toward entering the Louisville prefabricated housing market. The negotiations resulted in an agreement whereby Fortner's wholly-owned corporation, Fortner Enterprises, Inc., would acquire a portion of the subdivision and would become a franchised builder-dealer of the Homes Division product. The Credit Corporation would extend credit to the plaintiff for acquisition of 187 lots in the subdivision and development of the undeveloped lots conditioned on the construction, on each of the lots purchased by plaintiff, of a prefabricated house of the Homes Division of U. S. Steel. In addition to covering the cost of acquisition and development of the lots, a portion of the initial loan was to cover purchase and construction of the houses. The land loan equalled 100% of the cost of the land acquisition and development. Plaintiff's land financing was in the "special assistance" category.

Plaintiff later began to experience difficulties with U. S. Steel products, including the omission of parts and the delivery of defective parts. Homeowners who had purchased the homes from Fortner began to complain. About this time Fortner requested (and received on the same terms) additional financing for the purchase and development of more lots in the subdivision on which Homes Division houses were to be placed. On August 2, 1961, to secure the additional financing, Fortner executed a land and mortgage note and a construction note. After experiencing further difficulties with the prefabricated houses and running out of cash, Fortner requested that he be relieved of the requirement that the financing be used for the construction of Homes Division houses. The request was refused although Fortner was advised that he was free to refinance the Credit Corporation's loan and obtain houses from other sources. In July, 1962, he instituted this action, charging that defendants U. S. Steel and Credit Corporation had violated Sections 1 and 2 of the Sherman Act.

The district judge granted summary judgment in favor of defendants. This Court affirmed without opinion. The Supreme Court reversed in a 5–4 decision and remanded for trial. *Fortner Enterprises, Inc. v. United States Steel Corp.*, 394 U.S. 495, 89 S.Ct. 1252, 22 L.Ed.2d 495 (1969). Following a one-month jury trial, the district court directed a verdict for plaintiff on the issues of liability under the Sherman Act. Defendants' motion for a directed verdict was denied. The question of damages was submitted to the jury which returned a verdict of $93,200. This amount was trebled by the court in accordance with the provisions of the Sherman Act. The defendants did not appeal the damages issue, but limited their appeal to the issue of liability. This Court reversed the district court's judgment directing a verdict for plaintiff. *Fortner Enterprises, Inc. v. United States Steel Corp.*, 452 F.2d 1095 (6th Cir. 1971), *cert. denied*, 406 U.S. 919, 92 S.Ct. 1773, 32 L.Ed.2d 119 (1972). Although we found that the agreement was in fact a tie-in and that a not insubstantial amount of interstate commerce in the tied product was affected, we remanded for trial on the issue of sufficient economic power.[1]

---

1. The two elements required for a finding that a tying arrangement is a per se violation of Section 1 are set forth in *International Salt Co.*

*v. United States*, 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20 (1947): (1) a party (seller) must have sufficient economic power with respect to the

The parties on remand agreed to waive a jury trial and to submit the liability issue to the court on the evidence previously taken, as supplemented by some additional evidence. Adopting the findings of fact and conclusions of law proposed by plaintiff, the court found the liability issues under Sections 1 and 2 of the Sherman Act in favor of the plaintiff. Judgment was entered accordingly.

Defendants advance a number of arguments on appeal. The most significant of these involves the question of whether the district court applied the proper legal criteria for determining the economic power issue. Two other arguments will require consideration.

■■■ Defendants challenge the district court's findings on the question of economic power as being clearly erroneous.[2] On this issue plaintiff relies heavily on its view that the Credit Corporation loans were uniquely favorable to establish that defendants possessed the requisite economic power in the credit market. Defendants argue that the characterization of the loans here as 100% financing is incorrect because this figure was used to refer to 100% of Fortner's cost to acquire and develop the land, while the generally accepted meaning of a loan's percentage is the proportion it bears to the value of the land. They contend that the value of the lots acquired by plaintiff substantially exceeded the loan commitments and that there was thus no 100% financing. A

careful examination of the record indicates that the district court's determination that these loans were unique because they were 100% land acquisition and development loans is not clearly erroneous. The testimony of plaintiff's witnesses does not suggest that any of them misunderstood the context in which the 100% figure was used in this case. Since these witnesses were able to testify that a loan for 100% of the cost to acquire and develop property was unique at that time in the Louisville area, it is irrelevant that the percentage of the loan might be characterized in another way.

Defendants also claim that even if the evidence establishes that these were 100% loans which were unavailable elsewhere, the record fails to establish that the loans to plaintiff were more favorable than those available from other sources when all of the conditions of the respective loans are compared. When this case was before this Court in 1971, we recognized that the amount of the loan as a percentage of the collateral or security is only one element in determining its advantage to a borrower. *Fortner Enterprises, Inc. v. United States Steel Corp.*, 452 F.2d at 1101. While the testimony did not compare every relevant term of plaintiff's loans with terms of loans available elsewhere, we conclude that there was enough evidence[3] from which the district court could properly infer that the loans to plaintiff were

tying product to appreciably restrain free competition in the tied product and (2) a not insubstantial amount of interstate commerce must be affected.

**2.** We consider the clearly erroneous standard the proper standard for defining the scope of appellate review of factual findings by the district court. Defendants contend that more careful scrutiny of the record is required when a district judge, as here, adopts the proposed findings and conclusions of one party almost verbatim than when his findings clearly reflect the court's own thought processes. They also point out that a district court's findings are less conclusive when, as in this case, they are not based upon an assessment of witness cred-

ibility. While there may be some merit in both arguments, *see, e. g., A. J. Industries, Inc. v. Dayton Steel Foundry Co.*, 394 F.2d 357, 361–62 (6th Cir. 1968); *Roberts v. Ross*, 344 F.2d 747, 752 (3d Cir. 1965); *Louis Dreyfus & Cie. v. Panama Canal Co.*, 298 F.2d 733, 738 (5th Cir. 1962), departure from the clearly erroneous standard would not be required.

**3.** This evidence included plaintiff's own conclusion that the loan was uniquely favorable, testimony by representatives of other lending institutions comparing the terms and conditions of loans they were making at this time to those of plaintiff's loans, and the conclusion of plaintiff's expert witness that the loans were uniquely favorable.

uniquely favorable and that its findings in this respect are not clearly erroneous.

Defendants urgently insist that the district court failed to apply the proper criteria in determining that the defendants had sufficient economic power in the credit market to establish the *per se* illegality of the tying arrangement. The appropriate legal standard for this case was defined by the Supreme Court in its opinion reversing the original granting of summary judgment in this case in defendants' favor. *Fortner Enterprises, Inc. v. U. S. Steel Corp.,* 394 U.S. 495, 89 S.Ct. 1252, 22 L.Ed.2d 495 (1969). The same standard was indicated by this Court's opinion reversing the district court's granting of a directed verdict for the plaintiff on the issue of liability. *Fortner Enterprises, Inc. v. U. S. Steel Corp.,* 452 F.2d 1095 (6th Cir. 1971).

In its opinion, the Supreme Court stated that "the proper focus of concern is whether the seller has the power to raise prices, or impose other burdensome terms such as a tie-in, with respect to any appreciable number of buyers within the market." 394 U.S. at 504, 89 S.Ct. at 1259. Then, in holding that plaintiff was entitled to a trial under this standard, the Court said that the higher price charged for U. S. Steel homes as compared to the price for similar models of other manufacturers "may suggest that respondents had some special economic power in the credit market." *Id.* In addition, the Court pointed to the claim that the loan was uniquely advantageous to plaintiff as possibly reflecting some sort of economic advantage of U. S. Steel over its competitors. *Id.* at 505–06, 89 S.Ct. 1252. However, the Court rejected the argument that economic power could be inferred simply because the terms of a loan are unique. *Id.* at 505, 89 S.Ct. 1252. In a footnote which has received much attention, the Court went on to say that "uniqueness confers economic power only when other competitors are in some way prevented from offering the distinctive product themselves." *Id.* at 505, n.2, 89 S.Ct. at 1259.

The Court noted that possible barriers could be legal, physical, or economic, as when the seller has a cost advantage in producing the tied product. *Id.*

When the case was before this Court after the directed verdict, we emphasized the Supreme Court's rejection of the argument that uniqueness alone constitutes proof of sufficient economic power and discussed, in light·of the evidence presented, the factors which the Court thought would show economic power because they would prevent others from making similar loans. 452 F.2d at 1101. We concluded that plaintiff had made a prima facie case of economic power, but was not entitled to a directed verdict because of varying inferences which could be drawn from the record. *Id.* at 1097, 1101–03. Pointing out that the Supreme Court did not determine precisely what effect the comparatively higher prices for the Homes Division houses should have, we said that the probative value of this evidence should be determined by the trier of facts. *Id.* at 1103. We also noted that the Supreme Court in *Fortner* did not hold that "acceptance of the tie-in by customers without more is proof of economic power," since if this had been the holding, Mr. Justice Black hardly would have been required to discuss the economic power issue so exhaustively. *Id.* In a footnote, we also stated that we had not discussed all of the evidence bearing on the economic power issue which should be considered by a jury on remand, and further that the economic power standard "must vary in application from case to case, but the jury should be free to determine the issue on the basis of the entire evidence, . . . free from the limitations of an arbitrary definition." *Id.* at 1103, n.4.

These two opinions, considered together, show that plaintiff may not rely on uniqueness alone as a source of economic power in the credit market. Rather as the Supreme Court opinion makes clear, if uniqueness is the only indication of economic power relied upon, a plaintiff must show that competitors are prevented in some way from

offering the unique product themselves. 394 U.S. at 505, 89 S.Ct. 1252. However, if other factors in addition to uniqueness are relied upon as indicators of economic power, the requirement of showing that competitiors are prevented from offering the product is less stringent. In this type of situation the entire range of evidence—evidence of uniqueness as well as other relevant evidence—should be considered by the trier of the facts.

Thus, in this case, plaintiff might prevail even if it failed to show that other lending institutions were prevented from offering a loan on equally favorable terms, if it could show sufficient economic power by other evidence. Other evidence might include such factors as the non-competitive higher price of the tied product or the number of buyers accepting the tie-in—both of which were mentioned by the Supreme Court and by this Court. 394 U.S. at 504, 89 S.Ct. 1252; 452 F.2d at 1103. When a plaintiff does not rely on uniqueness alone, it is the overall sufficiency of the evidence which is controlling. We have recognized that customer acceptance of the tie-in without more is not sufficient to show economic power and have suggested that a non-competitive price is of uncertain probative value. 452 F.2d at 1103. · Yet, a number of such factors considered together may be sufficiently probative.

Here we must determine whether the district court applied proper criteria in its findings with respect to the element of economic power or leverage. If plaintiff relied solely on claims of uniqueness of the loans, its case for establishing that defendants had economic power in the credit market on the facts of the present case would be quite weak. Neither legal barriers nor a cost advantage, the two factors mentioned by the Supreme Court, were clearly shown to have prevented other lenders from making these loans. While the court below took notice that national banks and federal savings and loan associations were legally prohibited from making 100% loans, there was no similar evidence as to the many other types of lending institutions. Nor was there evidence that any lender was prohibited from varying other terms of loans so as to offer equally favorable financing. Although there was some evidence relevant to the existence of a cost advantage, the trial court failed to make any findings on this issue and plaintiff does not contend on appeal that a cost advantage was established. Indeed, the district court's findings suggest that, except for national banks and federal savings and loan associations, other lending institutions were not making such high percentage loans only because of their unwillingness to take the risk involved.

Plaintiff argues, however, that uniqueness did establish economic power in this case because other lending institutions in Louisville were not making loans at that time comparable to those made to plaintiff. It is insisted that the reasons such loans were not made is irrelevant. We must reject this argument and agree with defendants that the proper concern is not availability of the loans but the ability of other lenders to make them.

Since, however, the evidence offered by plaintiff to show economic power is not limited to the loan's uniqueness, the trial court was free to evaluate the other evidence along with the evidence of economic power derived from uniqueness in determining that defendants had sufficient economic power in the credit market appreciably to restrain free competition for prefabricated houses. Other evidence indicated that there was a substantial volume of business involving the tied product, that an appreciable number of customers accepted the tied product, and that the Homes Division houses cost $455 more than comparable homes. It is clear from the trial court's findings and conclusions that such evidence was evaluated. For example, in weighing the evidence, the district court stated:

> Millions of dollars of loans were made under the special financing category as identified in the Underwriting Agreement filed in this case. All of those loans contained the tie-in provisions. The Credit Corporation thus

utilized very effectively the special financing program to enable the Homes Division of United States Steel Corporation to sell millions of dollars of prefabricated houses. This is one of the elements of evidence establishing the economic power or leverage of the Credit Corporation. The fact that the Homes Division was able to obtain a higher price for its prefabricated package in the same condition of a conventional house is again evidence of the Credit Corporation's leverage, or economic power.

We conclude that, despite the district court's failure to find the factors suggested by the Supreme Court which would allow uniqueness to be relied upon as the only source of economic power, plaintiff presented other evidence from which the requisite economic power or leverage could properly be inferred.

Finally, defendants contend that there was no violation of Section 1 because the record shows that no competition in the tied product was actually foreclosed.[4] They base this contention on testimony of Fortner which, as they read it, would indicate that without the financing here, Fortner Enterprises would not have bought houses from any competitor of the Homes Division.

Recent cases have recognized that actual foreclosure of competition must be shown to establish an illegal tying arrangement. *Grossman Development Co. v. Detroit Lions, Inc.,* 1973–2 Trade Cases § 74,790 at pp. 95,939–95,940 (E.D. Mich.1973), *aff'd w/o opinion,* 503 F.2d 1404 (6th Cir. 1974); *Coniglio v. Highwood Services, Inc.,* 495 F.2d 1286 (2d Cir. 1974), *cert. denied,* 419 U.S. 1022, 95 S.Ct. 498, 42 L.Ed.2d 296 (1974). We do not interpret Fortner's testimony as indicating that no competition was actually foreclosed by the tie-in. The portion of the testimony directly responsive to the question asked shows only that Fortner would not have bought U. S. Steel homes without the financing, not that he would not have bought other homes. The thrust of the total testimony clearly shows that someone, either Fortner Enterprises or others for whom Fortner would have handled sales of houses, would have bought the homes of competitors of U. S. Steel if no similar credit had been offered, and thus that some competition was foreclosed.[5]

As we have concluded that the district court correctly found that a violation of Section 1 was established, it is unnecessary to consider whether the finding of a violation of Section 2 may also be upheld.

Affirmed.

---

4. The Supreme Court and this Court, while addressing themselves primarily to the substantiality of the amount of competition foreclosed, evidently felt that there was no problem in determining that foreclosure of competition had occurred. However, as defendants point out, neither of these courts had before it the testimony of Fortner discussed above.

5. This testimony was as follows:

Q. Mr. Fortner, at the time the October 28, 1960, loan agreement was signed would Fortner Enterprises have purchased the prefabricated house packages manufactured by the United States Steel Corporation without the financing offered by and made available in that loan agreement?

A. No, we would not. We would have stuck with some of the others that we was already having good success with. This Empire Homes, we had built eighty-seven of 'em, or Mr. Walzer had, and we handled them for him without any trouble whatsoever, but they didn't have any financing like that.

Q. When you say that you handled the eighty-seven homes for Mr. Walzer, what do you mean by that, sir?

A. We sold him the ground and, uh, we helped him with his financing and we handled the sales for him.