Sharon **BELL**, As Trustee in Bankruptcy of the Estate of Executive Airways, Inc., Bankrupt, Plaintiff-Appellee, Cross-Appellant,

v.

**CHEROKEE AVIATION CORPORATION**, Defendant-Appellant, Cross-Appellee.

Nos. 79–1228, 79–1229.

United States Court of Appeals, Sixth Circuit.

Argued Oct. 23, 1980.

Decided Oct. 7, 1981.

KEITH, Circuit Judge.

This case presents various issues regarding tying arrangements and Section 1 of the Sherman Antitrust Act. The defendant, Cherokee Aviation ("Cherokee") subleased space at the Knoxville, Tennessee airport to the plaintiff, Executive Aviation ("Executive"). In the lease agreement, Executive agreed to obtain certain goods and services only from Cherokee. The district court found that the lease provisions constituted a tying arrangement which violated Section 1 of the Sherman Antitrust Act. We agree and affirm Judge Robert Taylor's decision.

## FACTS

Cherokee is a fixed base operator (FBO) in the Knoxville area. An FBO provides various services for aircraft. An FBO rents hangar (i. e. indoor parking) and outside "tie-down" space for airplanes. It also provides fuel and maintenance services to aircraft owners. In effect, an FBO is a combination parking garage and gas station for airplanes. Cherokee was one of two FBO's located at McGhee-Tyson Field, the only airport in the Knoxville area that serves commercial airlines and private planes.

Executive was a limited or special FBO, engaged primarily in pilot training, aircraft rental and aircraft sales. *See* 14 C.F.R. Part 35. Executive was organized in 1968 as a flying club and operated as such for five years. Throughout this period, it operated from Cherokee's facility pursuant to an informal oral agreement. In early 1973, Executive's president and founder, Richard Hash, decided to expand Executive into a limited FBO. Executive needed license authority, some office space and outdoor tie-down space for its aircraft before it could begin its expanded operations. On June 1, 1973, Executive and Cherokee entered into a written agreement. Cherokee granted Executive a sublicense to operate as a limited FBO [1] and subleased office and tie-down

Lawrence F. Giordano, Stone & Hines, Harold B. Stone, Knoxville, Tenn., for defendant-appellant, cross-appellee.

Norman H. Newton, Crawford & Crawford, David T. Black, Kizer & Black, Maryville, Tenn., for plaintiff-appellee, cross-appellant.

Before KEITH, MERRITT and JONES, Circuit Judges.

1. In this agreement, Executive was licensed to operate the businesses of an air freight, air ambulance, aircraft rental, aircraft leasing, flight school and flight instruction. On July 12, 1973, the sublease was amended to allow Executive the privilege of operating an aircraft sales and charter service from Cherokee's premises. On July 1, 1974, the sublease and sublicense

space to Executive. In turn, Executive agreed to pay a rental fee[2] for the use of Cherokee's facilities as well as a royalty of 5% of its gross receipts.

This litigation arose because the agreement contained an additional provision requiring Executive to purchase from Cherokee all fuel, maintenance and parts required by Executive's airplanes. This clause states:

> Executive ... agrees specifically to have all maintenance on its aircraft performed by Cherokee with the understanding that Executive will be given the same consideration as all other Cherokee customers, and Executive agrees to purchase all needed fuel before each charter flight from Cherokee, emergency maintenance and emergency fueling, of course, being excepted.

Executive had financial difficulties and filed for bankruptcy. The trustee in bankruptcy filed this suit, contending that the above clause constituted an illegal tying arrangement in violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1,[3] and of Section 3 of the Clayton Antitrust Act, 15 U.S.C. § 14.[4]

The case was referred to a magistrate for trial. In a comprehensive opinion, the magistrate found liability and awarded damages and attorney's fees. The district court adopted the magistrate's findings and conclusions. Thereafter, this appeal was brought. The defendant has appealed on several grounds. The plaintiff has cross-appealed seeking additional damages.

## I. Preliminary Discussion

■ A tying arrangement or tie-in is an agreement by a seller to sell one product (the tying product), on the condition that a buyer also purchase a second product (the tied product) from the seller. In this case, the tying product is the sublease and sublicense for special FBO's. The tied products are fuel and aircraft parts and maintenance services. Simply stated, Cherokee conditioned the sublease of its property for Executive's special FBO services on Executive's purchase of fuel, maintenance and parts from Cherokee.[5]

The Supreme Court has construed Section 1 of the Sherman Act to prohibit contracts or combinations that "unreasonably" restrain trade. *Chicago Board of Trade v. United States*, 246 U.S. 231, 38 S.Ct. 242, 62 L.Ed. 683 (1918). The Court has determined, however, that certain agreements are so harmful to competition that they are *per se* unreasonable. *See Catalno v. Target Sales, Inc.*, 446 U.S. 643, 100 S.Ct. 1925, 64 L.Ed.2d 580 (1980) (an agreement to eliminate credit which amounted to price fixing); *National Society of Professional Engineers*

---

agreement was further amended to allow Executive to engage in the sale, maintenance and repair of electronic guidance equipment.

**2.** Executive's rent to Cherokee was set at $75.00 per month. Executive also agreed to pay Cherokee a monthly rental for the use of hangar space, ramps and tie-downs at Cherokee's regular published rates.

**3.** 15 U.S.C. § 1 provides:

> Every contract combination in the form of trust or otherwise, or conspiracy, in restraint of commerce among the several States, or with foreign nations, is hereby declared to be illegal.

**4.** 15 U.S.C. § 14 provides:

> It shall be unlawful for any person engaged in commerce, in the course of such commerce, to lease or make a sale or contract for sale of goods, wares, merchandise, machinery, supplies or other commodities, whether patented or unpatented, for use, consumption or resale within the United States or any

Territory thereof or the District of Columbia or any insular possession or other place under the jurisdiction of the United States, or fix a price charged therefor, or discount from, or rebate upon, such price, on the condition, agreement or understanding that the lessee or purchaser thereof shall not use or deal in the goods, wares, merchandise, machinery, supplies or other commodities of a competitor or competitors of the lessor or seller, where the effect of such lease, sale, or contract for sale or such condition, agreement or understanding may be to substantially lessen competition or tend to create a monopoly in any line of commerce.

This count was dismissed because the tying product in this case was land, which is not a commodity.

**5.** The elements of a tie-in case have been articulated in different ways. *See Yentsch v. Texaco, Inc.*, 630 F.2d 46, 56-59 (2d Cir. 1980). Also, see our discussion of coercion below.

*v. United States*, 435 U.S. 679, 98 S.Ct. 1355, 55 L.Ed.2d 637 (1978) (agreement among engineers not to discuss price with customers until engineers selected); *United States v. Topco Associates*, 405 U.S. 596, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972) (horizontal market division among competitors); *Albrecht v. Herald Co.*, 390 U.S. 145, 88 S.Ct. 869, 19 L.Ed.2d 998 (1968) (vertical price fixing); *Klor's Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959) (group boycott).

 One agreement which is *per se* unlawful is a tying arrangement. "[Tying arrangements] are unreasonable in and of themselves whenever a party has sufficient economic power with respect to the tying product to appreciably restrain free competition in the market for the tied product and a 'not insubstantial' amount of interstate commerce is affected." *Fortner Enterprises v. U.S. Steel, (Fortner I)* 394 U.S. 495, 499, 89 S.Ct. 1252, 1256, 22 L.Ed.2d 495 (1969), *citing Northern Pacific R. Co. v. United States*, 356 U.S. 1, 6, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958). *See United States v. Loew's, Inc.*, 371 U.S. 38, 83 S.Ct. 97, 9 L.Ed.2d 11 (1962); *Times-Picayune Publishing Co. v. United States*, 345 U.S. 594, 613–14, 73 S.Ct. 872, 883, 97 L.Ed. 1277 (1953); *International Salt Co. v. United States*, 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20 (1947); *Associated Press v. Taft-Ingalls Corp.*, 340 F.2d 753 (6th Cir.), *cert. denied*, 382 U.S. 820, 86 S.Ct. 47, 15 L.Ed.2d 66 (1965). The rationale for the *per se* rule is that "[tie-ins] deny competitors free access to the market for the tied product, not because the party imposing the tying requirements has a better product or a lower price, but because of his power or leverage in another market. At the same time buyers are forced to forego their free choice between competing products." *Fortner I, supra*, 394 U.S. at 498–499, 89 S.Ct. at 1256, *quoting Northern Pacific R. Co., supra*, 356 U.S. at 6, 78 S.Ct. at 518. Applying a *per se* rule to tie-ins "avoids the necessity for an incredibly complicated and prolonged economic investigation ... in an effort to determine ... whether a particular restraint has been unreasonable ...." *Northern Pacific R. Co., supra* at 5, 78 S.Ct. at 518.

 There are three core elements which make up a tie-in which is *per se* illegal: (1) there must be a tying arrangement between two distinct products or services; (2) the defendant must have sufficient economic power in the tying market to appreciably restrain competition in the tied product market; (3) the amount of commerce affected must be "not insubstantial". *Fortner I, supra*, 394 U.S. at 499, 89 S.Ct. at 1256; *Northern Pacific R. Co., supra*, 356 U.S. at 6, 78 S.Ct. at 518.

The magistrate concluded that all three elements were met by Cherokee's contractual requirement that Executive buy fuel, parts and maintenance from Cherokee. Accordingly, he found Cherokee liable. On appeal, Cherokee does not dispute the existence of the lease and license agreement between itself and Executive. Nor does it dispute that there was indeed a tying arrangement between two distinct products or services. Cherokee argues that it did not have sufficient economic power to effect a tying arrangement. It also claims that the amount of commerce affected by the tie-in was insubstantial. Cherokee also contends that the tie-in was not coerced, but was voluntarily chosen by Executive. Finally, both sides are unsatisfied with the magistrate's award of damages and attorney's fees. We shall discuss each of these claims.

II. "Sufficient Economic Power"

Cherokee's primary contention on appeal is that it did not have enough economic power to impose the tie-in. The standard for "sufficient economic power" has been stated in various ways:

The standard of "sufficient economic power" does not ... require that the defendant have a monopoly or even a dominant position throughout the market for the tying product. Our tie-in cases have made unmistakably clear that the economic power over the tying product can be sufficient even though the power falls far short of dominance and even though the power exists only with respect to some of the buyers in the market. (citations omitted) As we said in [*United States v. Loew's, Inc.*, 371 U.S. 38, 45, 83 S.Ct. 97, 102, 9 L.Ed.2d 11 (1962)] "Even

absent a showing of market dominance, the crucial economic power may be inferred from the tying product's desirability to consumers or from the uniqueness of its attributes." *Fortner I, supra,* at 502–03, 89 S.Ct. at 1258.

The Court also stated:

Accordingly, the proper focus of concern is whether the seller has the power to raise prices, or impose other burdensome terms such as a tie-in, with respect to any appreciable number of buyers within the market. *Id.* at 504, 89 S.Ct. at 1259.

■ In *U.S. Steel Corp. v. Fortner Enterprises,* 429 U.S. 610, 620, 97 S.Ct. 861, 867, 51 L.Ed.2d 80 (1977) (*Fortner II*), the Court articulated the standard as "whether the seller has the power, within the market for the tying product, to raise prices or to require purchasers to accept burdensome terms that could not be exacted in a completely competitive market. In short, the question is whether the seller has some advantage not shared by his competitors in the market for the tying product."

■ In this case, the magistrate found that Cherokee was in a "uniquely advantageous position" as a seller of subleases and sublicenses to persons seeking to establish a limited FBO in the Knoxville area. The magistrate reasoned as follows:

Cherokee in 1973 was three or four times larger than the only other general fixed base operator at McGhee-Tyson Airport, Smoky Mountain Aero, Inc. ("Smoky Mountain"). Executive's operations were to have been in direct competition with those of Smoky Mountain Aero. In fact, the president of Smoky Mountain in 1973, David Hiltz, testified at trial that he would have refused to sublease to Executive in 1973 had he been approached for this purpose.

McGhee-Tyson Airport itself was a highly desirable location for a special fixed base operation due to its size (it is the only airport in the area that is serviced by commercial airlines) and its proximity to Knoxville. The Knoxville Downtown Island Airport, the only other sizable airport close to Knoxville that was large enough to support a special fixed base operation, had two general fixed base operators already, one of which was engaged in the same operations that Executive wished to perform. In addition, all available hangar space at the Downtown Island Airport was occupied in 1973.

Barry Robinson, the vice-president and general manager of Stevens Beechcraft, Inc., a general fixed base operator at the Downtown Island Airport, testified that in 1973 his company was interested in subleasing to a special fixed base operator; however, such an operation would have been limited to Stevens to only flight instruction, aircraft rental, and sales. Although Richard Hash, the president of Executive, could have based his operations at Stevens Beechcraft in 1973, he would have been unable to expand his operation into a charter service, as he did in July, 1974. Mr. Robinson also testified that he would have required any sublessee operating out of Stevens Beechcraft's hangars to have all of its maintenance and fueling done by Stevens Beechcraft.

In addition to its size, Cherokee Aviation dominates the market for subleases and sublicenses at McGhee-Tyson Airport in several ways. Cherokee controls access to one of the two fuel farms at the airport, operates the airport's UNICOM system,* and has a very amicable relationship with the City of Knoxville, the operator of the airport.

Its economic power in the marketplace for subleases and sublicenses has been felt in many different ways, Cherokee subleases premises to the University of Tennessee, Agricultural Processors Cooperative Corporation, and Rentenbach Engineering Company. All of these entities are expressly prohibited from performing maintenance on any aircraft but their own. In addition to Executive, the only other *commercial* aviation operators that have leased space from Cherokee Aviation have had to agree to a tying arrangement with the defendant similar to the one with Executive. Hall-Mullins Aero, a partnership doing business as Tomahawk Airways, agreed to purchase all of the fuel and maintenance for its two

charter aircraft from Cherokee Aviation. Nelson Aviation, Inc., the special fixed base operator now operating at Cherokee, also agreed to purchase all needed fuel and maintenance from Cherokee in exchange for its sublicense from the defendant.

Cherokee Aviation's unique position in the Knoxville-Knox County general aviation community, as demonstrated by the factors above, placed in it the requisite economic power to appreciably restrain free competition in the market for fuel, maintenance and parts—tied products.

\* The UNICOM system is a radio communication system that allows communications between aircraft in flight and a fixed base operator (or to more than one fixed base operator via trunk line(s)). It is useful in scheduling ground transportation for incoming passengers and crews on general aviation aircraft and for the other "non-operational" communications with a fixed base operator. This system was also used to schedule refueling for aircraft flying on to other destinations. Obviously, a fixed base operator that had the only UNICOM system at an airport would enjoy a competitive advantage over other fixed base operators. No trunk lines were linked to the UNICOM system operated by Cherokee at any time material to this lawsuit.

Cherokee claims that it lacks the power to raise prices or impose burdensome terms. It emphasizes that it lacks monopoly power and that both it and Smoky Mountain Aero, the other general FBO at the field, have identical sublease authority since both FBO's lease their land from the City of Knoxville. Cherokee argues that space for Executive was available at McGhee-Tyson Airport and at nearby airports, but that Executive never bothered to inquire.

We cannot agree. The record is clear that Cherokee was a dominant firm which had preferable space for a limited FBO like Executive. Cherokee's lease and friendly relationship with the City of Knoxville gave it control over desirable land at the McGhee-Tyson Airport. Land is a unique commodity, especially at or surrounding an airport. In this respect, this case is similar to *Northern Pacific R. v. United States, supra*, where a railroad's extensive but not exclusive land holdings along its railroad tracks conferred enough economic power on the railroad to satisfy the Section 1 standard.

Cherokee's argument that Executive could have located elsewhere misses the point. The Supreme Court views tie-ins as serving "hardly any purpose beyond the suppression of competition." *Standard Oil of California v. United States*, 337 U.S. 293, 305–06, 69 S.Ct. 1051, 1058, 93 L.Ed. 1371 (1949). Tie-ins are illegal even absent monopoly power in the tying product. In *Northern Pacific, supra*, 356 U.S. at 7, 78 S.Ct. at 519, the land which the railroad sold or leased "was strategically located in checkerboard fashion amid private holdings and within economic distance of transportation facilities." A buyer or lessor of land from the railroad could presumably have bought or leased from a private landowner. However, for a number of persons, only the railroad's land was suitable. As to these persons, the railroad clearly had sufficient economic power to impose a tie-in. As the Court explained: "Not only the testimony of various witnesses, but common sense makes it evident that this particular land was often prized by those who purchased or leased it and was frequently essential to their business activities." *Id.* These same factors are present here. For Executive and any number of theoretical limited FBO's, only a sublease from Cherokee would suffice. *See Costner v. Blount National Bank of Maryville, Tenn.*, 578 F.2d 1192, 1196 (6th Cir. 1978) (Merritt, J.); *Moore v. Jas. H. Matthews & Co.*, 550 F.2d 1207 (9th Cir. 1977).[6] The record amply supports the magistrate's analysis of the numerous factors which made Cherokee unique and gave it economic power sufficient to impose the tie-in.

*Fortner II, supra*, provides no support to Cherokee. In that case, the tying product

**6.** The Court in *Fortner II*, 429 U.S. at 621 n.14, 97 S.Ct. at 868 n.14 approvingly quoted the following statement from a commentator:

Whenever there are some buyers who find a seller's product uniquely attractive, and are therefore willing to pay a premium above the price of its nearest substitute, the seller has the opportunity to impose a tie to some other good. (citation omitted)

was the provision of credit on favorable terms. Although the defendant in that case did offer unique credit terms, there was no evidence that it had cost or other advantages in the credit marketplace which gave it economic power over everyone else. *Id.* at 621–22, 97 S.Ct. at 868. *See also Yentsch v. Texaco, Inc.*, 630 F.2d 46 (2d Cir. 1980); *Phillips v. Crown Central Petro. Corp.*, 602 F.2d 616, 628–29 (4th Cir. 1979), *cert. denied*, 444 U.S. 1074, 100 S.Ct. 1021, 62 L.Ed.2d 756 (1980). In contrast, Cherokee's unique position leads directly to an inference of economic power. Unlike *Fortner II*, there is no evidence that anyone else could or would have offered Executive the same or a similar deal to that offered by Cherokee. The evidence was to the contrary.[7]

### III. "Not Insubstantial" Amount of Affected Commerce

■ The final element of an illegal tie-in is "whether a total amount of business, substantial enough in terms of dollar-volume so as not to be merely *de minimus*, is foreclosed to competitors by the tie . . . ." *Fortner I, supra*, 394 U.S. at 501, 89 S.Ct. at 1258. In this case, the total dollar-volume amount of business produced by Executive for Cherokee in the tied products (fuel, maintenance and parts) was $140,000 over a three-year period. In *Fortner I, supra*, the Court refused to declare insubstantial annual purchases of $190,000. *Fortner I, supra* at 501–02, 89 S.Ct. at 1257–58. In *United States v. Loew's, supra*, the volume of rele-

vant business was only $60,800. We agree with the magistrate that the volume of business involved in this case is not *de minimus*.[8]

### IV. Coercion

Cherokee argues that it should not be held liable because there is no evidence that it imposed the tie-in on Executive. Cherokee argues that it was Executive's president who initially proposed the tie-in. Cherokee argues that there is no evidence that it coerced Executive in any way. The dissent finds this argument persuasive. We do not.

In *Northern Pacific R., supra*, 356 U.S. at 5–6, 78 S.Ct. at 518, the Court defined an illegal tying arrangement as "an agreement by a party to sell one product but only on the condition that the buyer also purchases a different or tied product . . . ." In an accompanying footnote, the Court added that "[o]f course where the buyer is free to take either product by itself there is no tying problem . . . ." *Id.* at 6 n.4, 78 S.Ct. at 518 n.4.

This and similar language[9] has led some courts to hold that proof of individual coercion is an additional element that must be shown to establish an illegal tie-in. *See Ogden Food Service Corp. v. Mitchell*, 614 F.2d 1001 (5th Cir. 1980) (coercion an element of an illegal tie-in); *Ungar v. Dunkin' Donuts of America, Inc.*, 531 F.2d 1211, 1218 (3d Cir.), *cert. denied*, 429 U.S. 823, 97 S.Ct.

---

**7.** Donald Strunk, Cherokee's general manager, agreed that just prior to Cherokee's and Executive's entry into the sublease and sublicense agreement in 1973, there were no other facilities available from which Executive could perform the corporate purposes it desired to perform. App. at 77a. *Cf. Yentsch v. Texaco, Inc., supra* at 59 (2d Cir. 1980) ("no evidence that [defendant] dominated the regional market, owned the best sites, had a special deal on crude oil, petroleum products, or related supplies unavailable to other companies, or otherwise enjoyed a special position").

**8.** Cherokee argues that the $140,000 amount, over the approximately 3-year period of the tie, amounts to little more than $40,000 a year. Cherokee argues that this figure is insignificant. We agree with the magistrate that we are not bound to look to annual dollar volume.

We note that in *United States v. Loew's, Inc.*, 371 U.S. 38, 83 S.Ct. 97, 9 L.Ed.2d 11 (1962), the Court looked at the dollar size of the illegally block-booked contracts and not the annual dollar-volume of business under those contracts. Even if we were to look to annual volume, we are not prepared to say that $40,000 a year is insubstantial.

**9.** The following passage from *Times-Picayune Publishing Co. v. United States*, 345 U.S. 594, 605, 73 S.Ct. 872, 878, 97 L.Ed. 1277 (1953) is often quoted:

> By conditioning his sale of one commodity on the purchase of another, a seller coerces the abdication of buyer's independent judgment as to the "tied" product's merits and insulates it from the competitive stresses of the open market.

74, 50 L.Ed.2d 84 (1976) ("the common core of . . . unlawful tying arrangements is the forced purchase of a second distinct commodity"). Other courts have taken differing positions on this question. *See Photovest Corp. v. Fotomat Corp.*, 606 F.2d 704, 721–25 (7th Cir. 1979), *cert. denied*, 445 U.S. 917, 100 S.Ct. 1278, 63 L.Ed.2d 601 (1980) (express language in contract creates prima-facie tie-in case despite fact that plaintiff desired the tie-in); *Bogosian v. Gulf Oil Corp.*, 561 F.2d 434, 449 (3d Cir. 1977), *cert. denied*, 434 U.S. 1086, 98 S.Ct. 1280, 55 L.Ed.2d 791 (1978) ("once a plaintiff proves that a defendant has conditioned the sale of one product upon the purchase of another, there is no requirement that he prove that his purchase was coerced by the seller's requirement."); *Moore v. Jas. H. Matthews & Co., supra* at 1216–17 ("coercion may be implied from a showing that an appreciable number of buyers have accepted burdensome terms, such as a tie-in, and there exists sufficient economic power in the tying product market"); *Hill v. A–T–O, Inc.*, 535 F.2d 1349 (2d Cir. 1976) (an "unremitting policy of tie-in" if accompanied by sufficient market power constitutes coercion). *See generally* Bauer, *A Simplified Approach to Tying Arrangements: A Legal and Economic Analysis*, 33 Vanderbilt L.Rev. 283 (1980); Varner, *Voluntary Ties and the Sherman Act*, 50 S.Cal.L.Rev. 271 (1977); Austin, *The Individual Coercion Doctrine in Tie-In Analysis: Confusing and Irrelevant*, 65 Cal.L.Rev. 1143 (1977).

■ We do not think that coercion is an element of an illegal tying arrangement. As noted above, the Supreme Court has defined the elements of an illegal tie-in and has not suggested that coercion is such an element. We note that throughout the *Fortner* litigation, *Fortner Enterprises, Inc. v. United States Steel Corp.*, 394 U.S. 495, 89 S.Ct. 1252, 22 L.Ed.2d 495 (1969), *on remand*, 452 F.2d 1095 (6th Cir. 1971), *cert. denied*, 406 U.S. 919, 92 S.Ct. 1773, 32 L.Ed.2d 119 (1972), 523 F.2d 961 (6th Cir.

1975), *rev'd*, 429 U.S. 610, 97 S.Ct. 861, 51 L.Ed.2d 80 (1977), there was no suggestion in the opinions of this court, or the Supreme Court, that coercion was an element. Yet the record was clear that plaintiff Fortner had willingly agreed to the financing scheme in question and indeed "requested (and received on the same terms) additional financing (the tying product) for the purchase and development of more lots in the subdivision" where Fortner was building homes bought from U.S. Steel (the tied product). 523 F.2d at 963.

Coercion might be relevant in determining whether a seller in fact conditioned the purchase of one product on the purchase or lease of another. *See Kentucky Fried Chicken Corp. v. Diversified Packaging*, 549 F.2d 368 (5th Cir. 1977) (proof at trial did not show that coercion in the sense of conditioning one product on the purchase of another had occurred); *Ungar v. Dunkin' Donuts of America, Inc., supra; American Manufacturers Mutual Ins. Co. v. America B–P Theatres, Inc.*, 446 F.2d 1131 (2d Cir. 1971), *cert. denied*, 404 U.S. 1063, 92 S.Ct. 737, 30 L.Ed.2d 752 (1972) (proposed tie-in arrangement merely a bargaining ploy); *Advance Business Systems & Supply Co. v. SCM Corp.*, 415 F.2d 55 (4th Cir. 1969) *cert. denied*, 397 U.S. 920, 90 S.Ct. 928, 25 L.Ed.2d 101 (1970) (written contract, coupled with threatening conduct designed to enforce a tie-in violated Section 1).

■ Where the tie-in is clear on the face of the contract between Cherokee and Executive, there is no need to inquire into coercion. *Accord, Bogosian v. Gulf Oil, supra.* Conceivably, there could exist a set of facts where a plaintiff's conduct in seeking or agreeing to an illegal tie-in could create circumstances amounting to an estoppel. This would be true, for example, where a plaintiff inserted a tie-in clause into a contract solely to create a lawsuit. In such a case, it could not be said that the seller *conditioned* the purchase of one product on the purchase of another.[10] Cherokee argues

**10.** A similar argument was made in *Photovest Corp. v. Fotomat Corp.*, 606 F.2d 704, 722-25 (7th Cir. 1979), *cert. denied*, 445 U.S. 917, 100 S.Ct. 1278, 63 L.Ed.2d 601 (1980). There, the

court concluded that a tying arrangement was clearly illegal before June of 1971, as it was contained on the face of certain franchise agreements. Between June of 1971 and Sep-

that this is precisely what happened here, and that Executive's president Richard Hash never complained about the tie-in and that he proposed the tie-in to Cherokee.

Contrary to Cherokee's claims, however, the record supports the magistrate's finding that it did condition Executive's purchase of fuel, parts and maintenance on the granting of the lease. It is true that before the parties agreed to the lease, Executive routinely purchased fuel and maintenance from Cherokee. In addition there is no evidence that Cherokee issued an ultimatum to Executive. The law does not require this, however. Donald Strunk, Cherokee's general manager, testified that Cherokee requested the tie-in clause. App. at 79a. On one occasion, when Executive experienced financial difficulties, Cherokee allowed Executive to perform its own maintenance for about three months. Thereafter, Cherokee told Executive that it could no longer continue to perform its own maintenance. In fact, Cherokee employed the mechanic who performed Executive's maintenance during the three-month period, had him work on Executive aircraft, and then charged Executive its full rate for his work. App. at 87a. In sum, the record shows that Cherokee proposed the tie-in, enforced it, and benefited from it. It is true that Executive not object to the tie-in and that it is routine practice for one to buy fuel and maintenance where one's planes are based. Neither of these facts, however, justify a tie-in which *requires* one to purchase fuel, parts and maintenance where one is based.

## V. Other Justifications

■ Cherokee makes a variety of contentions in attempting to justify the tie-in. Principally, Cherokee argues that the tying arrangement was necessary to protect the public health and safety and to protect Cherokee from liability in case of an accident. We must agree with the magistrate that there is no reason why Cherokee could not protect the public safety and its own

liability by setting reasonable standards or specifications. *See Standard Oil Co. of California v. United States*, 337 U.S. 293, 306, 69 S.Ct. 1051, 1058, 93 L.Ed. 1371 (1949); *IBM v. United States*, 298 U.S. 131, 138–40, 56 S.Ct. 701, 704–05, 80 L.Ed. 1085 (1936).

We note that in Department of Transportation, Federal Aviation Administration ("FAA") advisory circular No. 150/5190–2A of April 4, 1972, interpreted 49 U.S.C. § 1349(a) as prohibiting unreasonable limitations on self-servicing at airports at which FAA-administered federal funds have been expended. In relevant part the advisory circular states:

> *Restrictions on Self-Service.* Any unreasonable restriction imposed on the owners and operators of aircraft regarding the servicing of their own aircraft and equipment may be considered as a violation of agency policy. The owner of an aircraft should be permitted to fuel, wash, repair, paint and otherwise take care of his own aircraft, provided there is no attempt to perform such services for others. Restrictions which have the effect of diverting activity of this type to a commercial enterprise amount to an exclusive right contrary to law. Local airport regulations, however, may and should impose restrictions on these activities necessary for safety, preservation of airport facilities and protection of the public interest. These might cover, for example, restrictions on the handling practices for aviation fuel and other flammable products, such as aircraft paint and thinners; requirements to keep fire lanes open; weight limitations on vehicles and aircraft to protect paving from overstresses, etc.

Given this advisory ruling, we see no justification for the tie-in. *See also Niswonger v. American Aviation, Inc.*, 411 F.Supp. 763 (E.D.Tenn.1974), *aff'd.*, 529 F.2d 526 (6th Cir. 1975).

---

tember of 1974, however, there was no tie-in since the defendant sent a letter foresaking the tie and did not act in such a way that a *de facto* tie could be inferred. After September of 1974, an illegal tie occurred when the defendant pressured the plaintiff not to switch photo process-

ing services from those offered by the defendant. The court subsequently went on to hold that a tying arrangement was *per se* illegal even though the plaintiff had desired it. 606 F.2d at 725.

## VI. Damages and Attorneys Fees

Neither party is satisfied with the magistrate's damages determination. In an antitrust case, a court must make a just and reasonable estimate of damages based on relevant data. *Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 264, 66 S.Ct. 574, 579, 90 L.Ed. 652 (1946); *Gaines v. Carrollton Tobacco Board of Trade, Inc.*, 496 F.2d 284, 286 (6th Cir. 1974). In a case such as this, the measure of damages is the difference between the price actually paid for the tied product and the price at which the product could have been obtained on the open market. *Pogue v. International Industries, Inc.*, 524 F.2d 342, 344 (6th Cir. 1975).

The magistrate accepted testimony from James Sexton, the president of Smoky Mountain Aero, that after May of 1974 he would have sold aviation gasoline to Executive at a 7 cents per gallon discount and that he did so to various similarly situated customers. From this, and from a retail price differential, the magistrate calculated the fuel overcharge at $11,380.75. Pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15, this amount was trebled to $34,142.25.

The magistrate rejected plaintiff's arguments that it could have performed its own maintenance and bought its own parts at a lower cost than that charged by Cherokee. The magistrate concluded that Cherokee's volume buying power and 10 per cent discount on parts sold to Executive resulted in savings to Executive greater than or equal to those it could have obtained on its own. The magistrate also concluded that the proof was uncertain as to how much it would have cost Executive to operate a complete maintenance shop.

In a supplemental memorandum, the magistrate awarded attorney's fees of $12,-000, far less than the approximately $30,000 initially requested.

Cherokee claims that the fuel award was speculative. Executive complains that it should have recovered for parts and maintenance overcharges. Cherokee also claims that it was an abuse of discretion for the magistrate to award attorney's fees ($12,-000) which were greater than the single-damage award of $11,380.75.

We see nothing wrong with the magistrate's careful, conscientious damages determination. Nor was there anything wrong with the magistrate's attorney's fees decision. *See Volasco Products Co. v. Lloyd A. Fry Roofing Co.*, 346 F.2d 661 (6th Cir.), *cert. denied*, 382 U.S. 904, 86 S.Ct. 239, 15 L.Ed.2d 157 (1965) (approving attorney's fees of $50,000 and a single damage award of $25,000).

## VII. Conclusion

The judgment of the district court is affirmed.

MERRITT, Circuit Judge, dissenting.

I disagree with the Court that the record in this antitrust case supports the conclusion that Cherokee had sufficient economic "leverage" or "market power" to give it the power to set a price for the tying products different from the price that would obtain in a fully competitive market. I also disagree with the Court that "there is no need to inquire into coercion" because "coercion" is not "an element of an illegal tying arrangement."

## MARKET POWER

The Court concludes that the relevant market in the tying products is limited to space and FBO licenses to operate at the main airport in Knoxville. There are three suppliers in that market, the city of Knoxville, which owns the airport, Cherokee, and its competitor, Smoky Mountain Aero, both of which leased from the city and could sublease to Executive. If the market were defined nationally or regionally, all would agree that Cherokee does not have any significant market power. It is simply one of many small FBO's competing for customers in the national or regional general aviation market.

Assuming, however, that the Court's narrow definition of the market is correct, still it is not at all clear from the record that Cherokee had significant market power in the tying products. The record does not

contain evidence concerning the available supply of FBO licenses and land at the airport or evidence concerning the nature, strength or elasticity of the demand for these items. The city of Knoxville, not Cherokee, is the main supplier of land and FBO licenses at the airport. It granted Cherokee its land and license in the first instance and approved the sub-license Cherokee gave to Executive. There is no showing in this record that Executive could not have purchased its license and space directly from the city. Thus, the record does not show what market power Cherokee had to set prices for licenses and space at the airport. Moreover, it does not appear from the record that Cherokee made large profits or that its power to charge a monopoly price, if it had such power, was used. For example, it is clear from the record that Cherokee lost money on its fuel and maintenance operations. (Rec. for 12–12–78, pp. 241–47.) The Court allows a substantial treble damage award to stand without any showing that the market for land and FBO licenses at the Knoxville airport was less than competitive and without a showing that Cherokee had the power to set prices in the market.

## COERCION

The Court's analysis of the coercion issue is even less satisfactory because the record clearly outlines the bargaining history of the parties concerning the tying arrangement. It affirmatively demonstrates the absence of any element of coercion. For several years prior to executing the formal, written contract with Cherokee, Executive Airways and its predecessor operated and kept its airplanes on an informal, month-to-month basis at Cherokee. During this time, Executive was under no contractual or express obligation to purchase its fuel from Cherokee. Yet it purchased all of its needed fuel, maintenance and parts from Cherokee, according to Richard Hash, the president and owner of Executive, who was also a law student at the University of Tennessee. He testified that the custom in the industry was "you bought fuel where you parked your airplanes." (Rec. for 12–12–78, pp. 84–85.) The General Manager of Chero-

kee testified that Hash approached him with the terms of the proposed, formal written contract. (Rec. for 12–12–78, pp. 188–90.) The proposed contract contained the agreement to purchase all fuel and routine maintenance from Cherokee. Hash did not deny that he proposed these terms of the contract. His explanation was that he "may have proposed the general terms . . ." with the idea that "that is the only way I would be able to operate from there." (Rec. for 12–12–78, pp. 34–35.)

The record also demonstrates that exclusive purchasing practices are customary in the general aviation industry and represent market preferences in the absence of written contracts. An aircraft owner normally selects an FBO on the basis of location, cost, convenience and the quality of service, and pays a monthly rental fee in order to tie down or hangar his airplane. Various engine, air worthiness and avionics inspections required by the Federal Aviation Administration are normally performed by the FBO repair stations. See 14 C.F.R. Parts 23, 33, 39, 43, 135, 145 (1980). The owner buys his fuel and routine maintenance services from the FBO except, as may frequently be the case, when the need arises when the aircraft is out of town.

These practices and expectations arise from certain assumptions of the industry concerning efficiency and safety. It is obviously more convenient for the FBO who provides tie down or hangar space to fuel the airplane. Ground operations at busy airports require advance communications with tower operators. See 14 C.F.R. § 91.87 (1980). Starting and taxiing aircraft across busy runways to another FBO for these services is costly in terms of pilot and controller time and aviation fuel consumption as well as increasing the possibility of accidents. According to the proof, liability, safety and efficiency considerations normally prevent fuel trucks from "running all over the airport" to fuel the customers of other FBO's. (Rec. for 12–11–78, p. 99.)

Thus the record shows that it is customary in the industry for aircraft owners to buy their fuel and maintenance services

from the FBO where they keep their airplanes. The record also shows that Executive followed this practice prior to the written contract and then proposed the written contract containing the tying arrangement. Executive did not object to the fuel arrangement during the life of the written agreement.

To say that these facts are irrelevant simply discards the economic theory on which the legal theory of tying arrangements is based. Some tying arrangements violate the ideal of a free, competitive market system because they wrongfully foreclose otherwise free markets from competitors and potential new entrants and injure customers by allowing a seller with leverage in one less-than-fully competitive market to abuse that power by forcing the consumer to deal only with him in another, more competitive market. Thus, it is said that an unlawful tie "*coerces* the abdication of buyers' independent judgment" concerning the tied product; its "common core . . . is the *forced purchase* of a second distinct commodity . . . resulting in economic harm to competition in the 'tied' market." *Times-Picayune Pub. Co. v. United States*, 345 U.S. 594, 605, 615, 73 S.Ct. 872, 878, 884, 97 L.Ed. 1277 (1953) (emphasis added). See also *Associated Press v. Taft-Ingalls Corp.*, 340 F.2d 753, 762 (6th Cir.), *cert. denied*, 382 U.S. 820, 86 S.Ct. 47, 15 L.Ed.2d 66 (1965) (ties force buyer to give up "independent judgment" as to whether, or where, to purchase tied product). The assumption is that economic actors must be able to make rational decisions based on their own self interests in the purchase and sale of products in order for the competitive, free market system to work. D. Bell, "Models and Reality in Economic Discourse," *The Public Interest* 46 (Special Issue, 1980). If, as a result of economic leverage, they are forced over time into exclusive tying arrangements, they cannot make such decisions and the conditions for workable competition are undermined. The assumption is that if we legalize such arrangements we will end up allowing one with economic leverage to engage in unjustified price discrimination. *United States Steel Corp. v. Fortner Enterprises, Inc.*, 429 U.S. 610, 617, 97 S.Ct. 861, 866, 51 L.Ed.2d 80 (1977) (Fortner II), or to extend his monopoly power in the tying product to another market, *Motion Picture Patents Co. v. Universal Film Mfg. Co.*, 243 U.S. 502, 518, 37 S.Ct. 416, 421, 61 L.Ed. 871 (1917), thereby further curtailing the supply of goods, raising prices, defeating consumer desires and unfairly increasing disparities of wealth and income.

But if there clearly are "other explanations for the willingness of buyers to purchase the package" than the seller's use of economic leverage, *Fortner II*, 429 U.S. at 618 n.10, 97 S.Ct. at 867 n.10, then the arrangement is not illegal. The economic leverage must not only exist but must be used to induce the tie. The wrong in tying cases is *the use* of monopoly power in the tying product to make the seller take an unwanted product.

Tying arrangement cases are, therefore, somewhat analogous to cases in which a seller wrongfully induces a transaction by striking or imprisoning another or threatening to do so. As in these duress and coercion cases, the wrong must cause the transaction. See Restatement of Contracts, Ch. 16 Duress and Undue Influence (1932); Restatement of Restitution, Ch. 3, Coercion (1937). There is no illegal tying arrangement if the buyer, in the absence of any compulsion, would have bought both products at the same price from the same seller anyway because he wanted a package. There must be "a manifestation of apparent assent by another to a transaction without his volition," a coercive element. Restatement of Contracts § 492.

In order for the legal standard and the underlying economic theory to be applied rationally, we must separate coercion from free choice, "forced abdication of independent judgment" from consumer preference. Although the kind of written contract that we have in the instant case obligating a buyer to purchase two or more products from the same seller raises a strong suspicion of coercion based on market power and warrants close scrutiny, our analysis should not end there when other factors suggest—indeed, demonstrate—the absence of coer-

cion. *See Photovest Corp. v. Fotomat Corp.*, 606 F.2d 704 (7th Cir. 1979), *cert. denied*, 445 U.S. 917, 100 S.Ct. 1278, 63 L.Ed.2d 601 (1980) (express language of agreement constitutes prima facie case of illegal tie that may be rebutted by fact that franchisee desired a complete package). In such situations, before we assume the existence of coercion and automatically find *per se* illegality, we should investigate not only the seller's market power but also the buyer's preferences. If the buyer proposed the economic arrangement, we should determine why. If the buying and selling arrangement in question follows common, everyday uncoercive patterns of buyers and sellers in the industry, we should determine whether the written arrangement is merely a reflection of the customary preferences of self-interested consumers or is a "forced purchase" arising from the seller's market power.

The record here shows that the customary and established pattern in the industry is for aircraft owners, in the absence of compulsion, to buy their maintenance service and fuel from the FBO where they rent space and house their airplanes. The plaintiff and the defendant both so testified. Aircraft owners normally do so for reasons of convenience, efficiency and safety. Prior to any contract, the plaintiff, without a tying arrangement or any form of compulsion, uniformly followed these buying practices for several years at the same FBO. During this time Executive bought its fuel and maintenance service from Cherokee. It did not shop around. Executive then proposed a written contract embodying its prior purchasing habits. Cherokee did not propose the tie. Executive proposed it. Executive never objected during the term of the contract to the requirement that it purchase fuel from Cherokee. When Executive proposed to do its own maintenance and repair work during the term of the contract, using Cherokee's facilities, Cherokee consented, but the arrangement turned out to be unsatisfactory. Based on this record, there is nothing to indicate that Cherokee used market power to force an inefficient unwanted market arrangement or to force "the abdication of

buyers' independent judgment" concerning the purchase of fuel and maintenance services. Accordingly, the judgment of the District Court for the plaintiff should be reversed. Far from being irrelevant, the element of coercion is an element of the wrong. It is absent here.